[No. 27824-0-I. Division One. October 11, 1993.]

THE STATE OF WASHINGTON, *Respondent*, v. GUINDA K. ASHCRAFT, *Appellant*.

*Mark D. Mestel* and *Mestel & Muenster,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Pamela Mohr, Deputy,* for respondent.

KENNEDY, J. — Guinda Ashcraft appeals her conviction of two counts of second degree assault and one count of simple assault, claiming that she was convicted in violation of the rule prohibiting ex post facto laws, that there was insufficient evidence for conviction on two of the counts, that the trial court admitted evidence erroneously, and that her constitutional right to trial by a jury of her peers was violated. Finding that the trial court erred in failing to reinstruct the jury on the record when an alternate juror was seated after deliberations had begun, we reverse and remand for a new trial.

## FACTS

Appellant became the custodian of a child, J., in November 1987. J. was almost 3 when she came to live with the appellant. Before October 1989, reports of possible child abuse with respect to J. were filed with Child Protective Services (CPS). No injuries were found when these reports were investigated. Instead, the caseworker found the appellant's relationship with J. to be very positive and found the appellant very cooperative during each investigation.

On October 15, 1989, Pamela Randles, the appellant's son's girlfriend, who was babysitting J., called the police and reported bruise marks on J. The police officers found bruises and decided to take J. to Children's Hospital for further investigation.

The examination at Children's Hospital was conducted by Drs. Kallas and Brownstein. Both doctors noted bruises on

J.'s body at the time of examination, some of which were over 3 days old. The doctors also noted bite marks consistent with the size of an adult mouth. At trial, Dr. Brownstein opined that the location of the bruises and their appearance were not consistent with accidental trauma and could only have resulted from being hit with an object. Dr. Brownstein also identified certain bruise marks which were consistent with being hit by a shoe that had a rigid sole.

Dr. Brownstein also indicated that he found some bruises which were consistent with being hit with a cord or rope and others which were consistent with being hit with a belt or ruler. When Dr. Brownstein asked J. if anyone had hurt her, she replied, "Yes, Mommy did." J. also told Dr. Kallas that "My mama did it." Both doctors concluded that J.'s injuries had been caused by child abuse.

After the examination at Children's Hospital, J. was removed from the appellant's home, and an investigation was started of the appellant. After she was contacted by the police at her place of employment, the appellant gave a written statement to the police, saying that she had only disciplined the child with her hand on the child's buttocks and that, when she had bathed the child 2 nights before the medical examination, she had noticed no bruises.

After a further investigation, appellant was arrested and charged with three counts of assault in the second degree, in violation of RCW 9A.36.021(1)(a). The charges asserted that appellant was guilty of assaulting J. with a stick, a shoe and a belt, respectively, between November 1, 1987, and October 15, 1989.

During jury selection for the trial, the prosecutor exercised all six peremptory challenges. One of those peremptory challenges was to an African-American woman, Ms. Strong. The defense objected to this challenge, claiming that it was based on race and that a pattern of exclusion of identifiable "minorities" was established, based on the exclusion of Ms. Strong as well as an exclusion of Mr. Bayat, who was Iranian-American. Responding to this challenge, the prosecutor stated that Ms. Strong seemed "nervous and evasive" in her

responses and that this was why the challenge was exercised. The court responded that this was sufficient.

After appellant advised the court that she would not be willing to waive her right to 12 jurors, an alternate juror was selected.

During trial, in addition to the testimony of the doctors, police, and CPS caseworkers who had investigated prior reports, there was testimony from a former friend of the appellant's, Shelia Rogers. Ms. Rogers testified that, prior to the summer of 1988, she saw the appellant at two different times swing a shoe and a stick at J. Ms. Rogers stated that she never actually saw the objects make contact but could see the swinging and hear the child's cries. Laura Mitchell, the director of a daycare facility which J. attended, also testified. She testified that one time J. was dropped off at daycare with bruises on her face.

Defense witnesses testified that Ms. Randles, who had reported the bruises which led to the charges, had herself used force, including a belt, to discipline children.

The case was submitted to the jury on December 18, 1990. The alternate juror was temporarily excused but not discharged. The jury deliberated that day from 11:30 a.m. to 2:30 p.m., but due to adverse weather conditions did not reconvene until noon on December 21, 1990.[1] At that time, a minute entry noted that, due to the unavailability of juror three, Jeffrey Pascoe, the court replaced him with the alternate juror, Susan Goodin. The record indicates that the juror who was replaced had a flight to Belgium. At 3:22 p.m. on December 21, the parties were notified that the jury had reached a verdict. The jury returned a verdict of guilty on counts 2 and 3, for the assaults with the shoe and belt, and guilty of the lesser included offense of simple assault on count 1, for the assault with the stick. The trial judge being unavailable, the verdict was delivered before a different judge.

---

[1]After the jury began deliberations, a heavy snowstorm hit the Puget Sound area cutting off transportation for several days and closing many courthouses and other public facilities.

After verdict, the defendant objected to the replacement of juror Pascoe with the alternate juror, claiming that the defense was not consulted about the replacement, and that the court erred in failing to instruct the jury to begin deliberations anew after seating the alternate juror. Appellant was sentenced to 12 months and 1 day, the bottom of the standard range. This appeal followed.

## DISCUSSION
### I
### Ex Post Facto Violation

Appellant first contends that the law under which she was charged and convicted, RCW 9A.36.021(1)(a), was an ex post facto law because it was not adopted until July 1, 1988, and the period during which the activities for which she was charged allegedly occurred included time before the statute's enactment. Specifically, the charges alleged conduct occurring from November 1987 through October 15, 1989.

Both article 1, section 9 of the United States Constitution and article 1, section 23 of the Washington State Constitution prohibit conviction of a crime for acts which were not considered criminal at the time they were committed.

> A law violates the ex post facto prohibition if it aggravates a crime or makes it greater than it was when committed; permits imposition of a different or more severe punishment than was permissible when the crime was committed; or changes the legal rules to permit less or different testimony to convict the offender than was required when the crime was committed.

*State v. Edwards*, 104 Wn.2d 63, 70-71, 701 P.2d 508 (1985).

> A law violates the ex post facto clause if it: (1) is substantive, as opposed to merely procedural; (2) is retrospective (applies to events which occurred before its enactment); and (3) disadvantages the person affected by it.

*In re Powell*, 117 Wn.2d 175, 185, 814 P.2d 635 (1991), *writ of habeas corpus granted sub nom. Powell v. Ducharme*, No. C91 1461 Z (W.D. Wash. Oct. 25, 1991), *rev'd*, 998 F.2d 710 (9th Cir. 1993). Appellant contends that the new second degree assault law under which she was prosecuted disadvantaged her because it criminalizes certain actions that may not have been

previously criminalized during part of the period in which she was charged. Specifically appellant contends that, under the prior law, assault with an instrument "likely to produce" bodily harm was criminalized as second degree assault while under the new law second degree assault is committed only if substantial bodily harm is in fact inflicted.

▪ When considering whether a recodification of law disadvantages a defendant, a court must consider whether the legal consequences of committing the act have changed with the new law. *Edwards*, 104 Wn.2d at 71.

> "[A]lterations which do not increase the punishment, nor change the ingredients of the offence or the ultimate facts necessary to establish guilt, but — leav[e] untouched the . . . amount or degree of proof essential to conviction . . ." do not violate the ex post facto provision.

*Edwards*, 104 Wn.2d at 71 (quoting *Hopt v. Utah*, 110 U.S. 574, 590, 28 L. Ed. 262, 4 S. Ct. 202 (1884)).

A comparison of the second degree assault statute in effect prior to July 1, 1988, with the second degree assault statute in effect after July 1, 1988, reveals that the punishment entailed and the degree of proof needed for conviction of the crimes of which appellant was charged did not change to the appellant's disadvantage after July 1, 1988.

Prior to July 1, 1988, assault in the second degree was defined in pertinent part as follows:

> (1) Every person who, under circumstances not amounting to assault in the first degree shall be guilty of assault in the second degree when he:
>
> . . . .
> (c) Shall knowingly assault another with a weapon or other instrument or thing likely to produce bodily harm; . . .

RCW 9A.36.020.

After July 1, 1988, assault in the second degree was defined, in pertinent part, as follows:

> (1) A person is guilty of assault in the second degree if he or she, under circumstances not amounting to assault in the first degree:

· (a) Intentionally assaults another and thereby recklessly inflicts substantial bodily harm; . . .

RCW 9A.36.021.

■ The activity for which appellant was charged would constitute second degree assault both under the old second degree assault statute and the new statute under which the appellant was actually charged. Intentional assaults with a stick, shoe and belt, thereby recklessly causing substantial bodily harm, constituted second degree assault under the pre-July 1, 1988, statute as well as the statute under which appellant was charged, even though the language used in the former statute criminalized only the use of objects "likely" to cause bodily harm.

Our courts have explicitly held that an object need not have an "inherent" ability to inflict great bodily harm to satisfy the former assault statute; the object must merely have the apparent present ability to inflict such harm. *See State v. Curtis*, 14 Wn. App. 735, 737, 544 P.2d 768, *review denied*, 86 Wn.2d 1012 (1976). We have recognized that other blunt instruments, such as steel slats, may be perceived as having this ability to cause bodily harm. *See State v. Gosser*, 33 Wn. App. 428, 438, 656 P.2d 514 (1982). Under the former statute, this was a question of fact. *Gosser*, 33 Wn. App. at 438. Thus any object that *does cause* substantial bodily harm under the latter statute would most certainly have the "apparent present ability" to inflict such harm if used in the same manner under the former statute. Its use, if criminalized under the new statute, would thus be criminalized by the former statute as well. The jury in this case found that the shoe and belt did in fact cause substantial bodily harm, and thus appellant's activities would have been found to violate the former statute as well.

Although not directly challenged by appellant, we also note that a difference in the use of the terms "knowingly" and "intentionally" between the statutes does not change the effect

of the law. For purposes of assault, "knowingly" has been deemed equivalent to "intentionally". RCW 9A.08.010(2).

Therefore, we can perceive no ex post facto violation for appellant's convictions on counts 2 and 3 because she was charged under the later statute for crimes which could have been committed before its effective date.

■ As for the simple assault conviction for count 1, the simple assault statute in effect before July 1, 1988, is essentially identical to assault in the fourth degree which was codified after July 1, 1988. RCW 9A.36.040(1), effective before July 1, 1988, specifically states that

> [e]very person who shall commit an assault or an assault and battery not amounting to assault in either the first, second, or third degree shall be guilty of simple assault.

RCW 9A.36.041(1), effective after July 1, 1988, states that

> [a] person is guilty of assault in the fourth degree if, under circumstances not amounting to assault in the first, second, or third degree, or custodial assault, he or she assaults another.

No new activity was criminalized by the recodification and indeed the only difference between the statutes is that custodial assault will no longer be considered a simple assault, actually reducing the activity for which a person could be convicted of fourth degree or simple assault.[2] Therefore, there was no ex post facto violation with respect to count 1.

## II
### Sufficiency of the Evidence

■ Appellant next contends that there was insufficient evidence to convict her of the crime in counts 1 (stick) and 2 (shoe).

> The test for determining the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt. When the sufficiency of the evidence is challenged in a criminal case, all reasonable inferences from the evidence must be drawn in favor of the State

---

[2]The penalty for a simple assault on corrections facility workers or volunteers (custodians) was changed from a gross misdemeanor to a class C felony in the recodification of the assault statutes. RCW 9A.36.100.

and interpreted most strongly against the defendant. A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom.

(Citations omitted.) *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).

In the present case, the evidence was sufficient to support the convictions for simple assault with the stick for count 1 and second degree assault with the shoe for count 2.

■ In order to establish simple assault, the State need only show actual physical striking or touching of another, with or without physical harm. Shelia Rogers testified that she saw the appellant appear to strike the victim with a stick while the victim was crying. Moreover, she testified that J. sat quietly for the rest of the day, which is not normal behavior for a child of that age. This leads to a reasonable inference that the striking occurred. There is thus sufficient evidence to support the conviction for simple assault.

■ As for count 2, in order to find assault in the second degree, the State must prove that the defendant intentionally committed an assault and thereby recklessly inflicted substantial bodily harm. Substantial bodily harm is defined as "bodily injury which involves a temporary but substantial disfigurement . . . .." RCW 9A.04.110(4)(b). The doctors at Children's Hospital testified that they saw bruise marks on J. which would be consistent with her being hit with a shoe. The presence of the bruise marks indicates temporary but substantial disfigurement.

As for evidence that this injury was the result of an intentional assault and thereby recklessly inflicted by the appellant, Shelia Rogers testified that she saw the appellant turning around and apparently hitting J. with a shoe. Although the bruise marks found by the doctors would not be consistent with the specific shoe beating that Rogers witnessed, because of the lapse of time between this incident and the examination by the doctors, the jury could still reasonably infer that the shoe mark was caused by a later intentional beating with a shoe by the appellant. During her medical examination, J. herself stated that her "mama" did this to

her, and there was testimony that J. referred to appellant as "mama" at this time. Therefore, there was substantial evidence from which the jury could have convicted the appellant of second degree assault on count 2.[3]

## III
### Admission of J.'s Hospital Statements

Appellant next contends that it was error for the trial court to allow the admission of J.'s statements to her treating physicians to the effect that her "mama" caused her injuries.

ER 803(a)(4) allows the admittance of hearsay testimony if the statement was made for the purpose of a medical diagnosis or treatment. Normally, such testimony is not admissible if it identifies the perpetrator of a crime, but an exception has arisen to this rule when the victim is a child. *State v. Butler*, 53 Wn. App. 214, 766 P.2d 505, *review denied*, 112 Wn.2d 1014 (1989).

In *Butler*, this court examined at length the purposes of ER 803(a)(4) and the times when hearsay evidence concerning the identity of the perpetrator of a crime can be admitted when the victim is a child. This court ruled that such statements could be admitted as part of the doctor's testimony regarding medical treatment if the information was necessary for diagnosis and treatment. In ruling that the incriminating identification was necessary for diagnosis and treatment in that case, we reasoned that, in abuse cases, it is important for the child to identify the abuser in seeking treatment because the child may have possible psychological injuries and also may be in further danger, due to the continued presence of the abuser in the child's home. *Butler*, 53

---

[3]Similarly, the belt bruise marks seen by the doctors and J.'s testimony that her mother hit her with a belt were sufficient to support the conviction in count 3, though this was not argued in the appellant's opening brief. Failure to present argument in a brief waives an appeal of that error. *Murphy v. Murphy*, 44 Wn.2d 737, 270 P.2d 808 (1954).

Wn. App. at 222-23; *see also In re S.S.*, 61 Wn. App. 488, 503, 814 P.2d 204, *review denied*, 117 Wn.2d 1011 (1991).

Similarly, in the present case, the victim lived in the accused's home. The child had been determined to be the victim of probable abuse, raising questions of possible psychological injuries, as well as questions with respect to her safety. Therefore, as in *Butler*, J.'s identification was necessary to allow for her proper diagnosis and treatment.

■ Appellant contends there is an additional requirement for admittance of perpetrator identification, that being that the child *herself* must understand that such identification is required for her treatment before the identification will be admissible under this rule. In *United States v. Renville*, 779 F.2d 430 (8th Cir. 1985), a case cited by appellant, the Eighth Circuit indicated that, in order for perpetrator hearsay to be admitted under the medical treatment hearsay exception, it must be necessary for treatment *and* also must have been relayed by the declarant with the understanding that it was to promote treatment. This is to ensure the reliability of the information by making sure the patient recognizes his or her self-interest in being truthful.

However, in *Butler*, this court distinguished *Renville*, finding that, when a declarant is too young to appreciate that information is being given to promote treatment, then that child's testimony may still be considered reliable because at a very young age a child would have no reason to fabricate the nature of her injuries. *Butler*, 53 Wn. App. at 223. We also held that the fact that there is no apparent appreciation of the need to give information to promote treatment is less important where there is corroborative evidence. *Butler*, 53 Wn. App. at 223.

Therefore, it is not per se a requirement that the child victim understand that his or her statement was needed for treatment if the statement has other indicia of reliability. Such indicia are present here. Although J. probably did not understand that her statement would aid in her treatment,

because of her young age she appeared to have no reason to fabricate the nature of her injuries, just as the child in *Butler* had no reason for fabrication.[4]

Moreover, there was strong corroborating evidence supporting J.'s statements. The appellant made a sworn statement that she had bathed J. two nights earlier and had noticed no bruises on her body. However, the treating physicians testified that at least some of the bruises on J.'s body had to have been over 3 days old. When the accused gives a story regarding the abuse which is implausible, this can be considered as corroborating evidence of the child's accusatory statements. *Butler*, 53 Wn. App. at 223. Therefore, we hold that the trial court correctly admitted J.'s statements to her treating physicians.[5]

## IV
### Exclusion of African-American Juror

Appellant next contends that her constitutional rights were violated when the lone African-American on the jury panel was dismissed by a peremptory challenge. "The United States Supreme Court has held that the use of race-based peremptory challenges to exclude blacks from petit juries is a form of race discrimination." *State v. Burch*, 65 Wn. App. 828, 833, 830 P.2d 357 (1992) (citing *Batson v. Kentucky*, 476 U.S. 79, 88-89, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986)). As such, the purposeful exclusion of members of the defendant's race violates the defendant's right to a jury trial of his or her peers, undermines public confidence in the justice system and also violates the Fourteenth Amendment rights of the excluded juror to full citizen participation. *Batson*, 476 U.S. at 93.

---

[4] We also note that the presence of indicia of reliability satisfies the test for admittance of hearsay testimony when no cross examination is allowed. *See Idaho v. Wright*, 497 U.S. 805, 817, 111 L. Ed. 2d 638, 110 S. Ct. 3139, 3148 (1990).

[5] Appellant contends that the statement was not reliable because J. called more than one person mother. It is true that, in addition to referring to the appellant as mother, J. also referred to her female foster parent as mother. However, this does not make identification of "mama" less reliable. There was no evidence that J. called anyone else mama at the time the identification was made.

Under *Batson*, . . . the defendant establishes a prima facie case first by showing that the peremptory challenge was exercised against a member of a constitutionally cognizable group. Second, the defendant must demonstrate that this fact "and any other relevant circumstances raise an inference" that the prosecutor's challenge of a venire person was based on group membership.

In deciding whether a prima facie case has been established, the trial court "should consider all relevant circumstances", including a "pattern" of strikes against members of a constitutionally cognizable group and the "prosecutor's questions and statements during *voir dire* examination."

Once the defendant has established a prima facie case of purposeful discrimination, the burden shifts to the State to "articulate a neutral explanation related to the particular case to be tried."

(Citations omitted.) *Burch*, 65 Wn. App. at 840.

█ Appellant contends that a prima facia case was established simply because the excluded juror was African-American. We disagree. In *Batson*, the Supreme Court held that a "pattern" of strikes against black jurors in a venire *might* give rise to a prima facie case of discrimination if supported by the surrounding facts of the case. *Batson*, 476 U.S. at 97. Here, there was no "pattern" of exclusion. In the present case, the challenged juror was the only African-American excused from this case. This is generally insufficient to establish a prima facie case. *See State v. Powell*, 55 Wn. App. 914, 916, 781 P.2d 899 (1989) ("The State's exercise of a single peremptory challenge was not enough, and the record shows nothing more."), *review denied*, 114 Wn.2d 1006 (1990). Of course the challenged juror was the only African-American in the panel, but this fact cannot be attributed to the prosecution.

Moreover, even if the exclusion of the lone African-American from the jury could be considered a "pattern" of exclusion, appellant has cited no other circumstances which would support a determination of a prima facie case of racial exclusion in the present case. In *Burch*, this court held that a prima facie case of discrimination based on gender was not necessarily established because the prosecutor stated that the State wanted as "many males as possible". Here, where there were no other circumstances indicating purposeful exclusion

of African-Americans from the jury, no prima facie case of racial exclusion was established.

In any event, the evidence indicates that, even if a prima facie case were established, it was rebutted by a race neutral explanation. "An explanation is neutral unless a discriminatory intent is inherent therein." *Burch*, 65 Wn. App. at 840. Here, the prosecutor stated that Ms. Strong seemed "nervous and evasive". On its face, this does not reveal an inherently discriminatory motive, nor does it imply a racial stereotype as a reason for dismissal. *See Burch*, 65 Wn. App. at 840. "Nervousness" and "evasiveness" are related to demeanor, and this court has stated that "[a] venire person's specific responses and demeanor during voir dire may constitute neutral explanations for exercising a peremptory challenge." *See Burch*, 65 Wn. App. at 840; *see also State v. Morales*, 53 Wn. App. 681, 769 P.2d 878, *review denied*, 112 Wn.2d 1028 (1989), wherein the Court of Appeals determined that apparent nervousness of a juror was a valid race neutral reason for exclusion. The record shows that, for at least part of her testimony, the dismissed juror seemed to have difficulty answering a question about her experience as a victim of a previous crime, justifying the use of this reason.

Therefore, in this case, the appellant's constitutional right to a jury of her peers was not violated by the exclusion of the one African-American in the jury panel.[6]

## V
### Seating of Alternate Juror

We are substantially more troubled by the trial court's seating of an alternate juror without giving the parties any opportunity for input and without a record of reinstruction. Appellant contends that the trial court erred in substituting an alternate juror before determining that the regular juror was unable to serve, in substituting an alternate juror without holding a hearing, and in failing to instruct the jury to begin deliberations anew when the new juror was seated.

---

[6]Appellant has not argued on appeal her complaint at trial that a purposeful pattern of discrimination against "minorities" was established by the exclusion of Ms. Strong and an Iranian-American jury member.

CrR 6.5 governs the use of alternate jurors. It states that:

[an] alternate juror may be recalled at any time that a regular juror is unable to serve, including a second phase of any trial that is bifurcated. If the jury has commenced deliberations prior to replacement of an initial juror with an alternate juror, the jury shall be instructed to disregard all previous deliberations and begin deliberations anew.

■ There are no published Washington cases regarding any of the specific contentions raised by the appellant, but case law from other jurisdictions construing a similar criminal rule has indicated that a trial court's decision as to whether a juror is unavailable, for purposes of replacing him or her with an alternate juror, is reviewed under an abuse of discretion standard. *People v. Abbott*, 690 P.2d 1263, 1268 (Colo. 1984).

Other Washington case law indicates that this should be the proper standard of review in Washington as well. In Washington, trial courts have control over all aspects of the docket and cases which come before them, and are vested with the power to manage that caseload. *Swan v. Landgren*, 6 Wn. App. 713, 715, 495 P.2d 1044 (1972). This power to manage the court docket derives from the state constitution as well as from legislation giving the courts the power to adopt civil and criminal rules of procedure. *Swan*, 6 Wn. App. at 715. In *Swan*, the exercise of this power was recognized as discretionary with the trial court. *Swan*, 6 Wn. App. at 716. Since the power to replace a juror in a certain manner is based on the criminal rules promulgated by our court system, it, too, is vested in the discretion of the court. Therefore, we hold that an abuse of discretion standard should govern the court's decision in determining whether a juror is "unable" to attend trial.

■ CrR 6.5 states that a court may replace a juror who is "unable" to attend the trial. The record reflects that the replaced juror had a flight to Belgium and that jury deliberations had become delayed or prolonged due to adverse weather conditions. In cases governing the availability of witnesses whose hearsay testimony has been allowed as evidence, this court has stated that the witness's planned vacation was a

sufficient basis for the court to find that the witness was unavailable. *See, e.g.*, *State v. Hobson*, 61 Wn. App. 330, 336, 810 P.2d 70, *review denied*, 117 Wn.2d 1029 (1991). We hold that this is also an adequate reason for determining that a juror is "unable" to attend a trial, where jury deliberations have become delayed or prolonged due to adverse weather conditions and an alternate juror is reasonably available.

Appellant contends that, even if it factually appears that the juror was unable to attend the trial, the trial court erred in failing to hold a hearing before making this determination. Appellant cites a Massachusetts case, *Commonwealth v. Perez*, 30 Mass. App. Ct. 934, 569 N.E.2d 836 (1991), for the proposition that the replacement of a deliberating juror with an alternate is a stage of a trial where substantial rights might be affected; therefore before a juror can be replaced there must be notice and a hearing. *Perez*, at 935.

The State contends that if the trial court erred in failing to give notice and an opportunity for input by the parties, the error was harmless in that appellant had earlier notified the court, during jury selection, that she would not proceed with only 11 jurors. Thus, an alternate juror was selected in case an initial juror might become unable to serve, the very eventuality which here arose. The State also points out that appellant objected to the seating of the alternate juror and raised the reinstruction issue only after the verdict was delivered before a different judge, and that the appellant brought no posttrial motions, thereby preventing the trial judge from responding to these issues.

CrR 6.5 does not specify that a hearing is required before a deliberating juror can be replaced with an alternate juror. The rule does, however, clearly contemplate a formal proceeding which may include brief voir dire to insure that an alternate juror who has been temporarily excused and recalled has remained protected from "influence, interference or publicity, which might affect that juror's ability to remain impartial". CrR 6.5. Moreover, the rule requires that a jury which has commenced deliberations before an initial juror is replaced by an alternate juror "shall be instructed to

disregard all previous deliberations and begin deliberations anew." CrR 6.5. These are matters which relate directly to a defendant's constitutional right to a fair trial before an impartial jury and to a unanimous verdict. *Cf. State v. Fisch*, 22 Wn. App. 381, 383, 588 P.2d 1389 (1979) (the 12 jurors "must reach their consensus through deliberations which are the common experience of all of them").[7] As such, they are not the proper subject for an ex parte judicial proceeding, even where there is valid cause to replace an initial juror with an alternate juror.

Although the decision to replace an initial juror with an alternate juror after deliberations have commenced rests in the sound discretion of the trial court, it does not follow that the parties have no right to notice and an opportunity for input before such discretion is exercised. Many decisions of the trial court are discretionary. They should not be made, however, without according the parties an opportunity to provide the court with arguments and authority which bear upon the decision to be made. This is particularly so where the decision to be made directly affects the fundamental right to trial by jury and necessarily involves communications between the trial judge and a deliberating jury.

It is a settled rule in Washington that there should be no communication between the trial judge and the jury outside the presence of the parties or in the absence of notice to the parties or their counsel. *Cf.* CrR 6.15(f)(1) (governing the giving of supplemental instructions at the request of the jury after deliberations have begun; requiring notice to the parties or their counsel if the parties are not already present when any such instruction is to be given). *See also State v. Caliguri*, 99 Wn.2d 501, 508-09, 664 P.2d 466 (1983) (holding that the trial court erred in its ex parte decision to replay

---

[7] For these reasons, we reject the State's contention that the appellant has failed to preserve these issues for appeal by failing to timely object and by failing to bring any posttrial motions. Manifest error affecting a constitutional right may be raised for the first time on appeal. RAP 2.5(a); *State v. Scott*, 110 Wn.2d 682, 688 n.5, 757 P.2d 492 (1988) (failing to require a unanimous verdict is a "manifest" constitutional error).

tapes for deliberating jury without defendant's presence but overruling prior cases holding that ex parte communication between judge and jury is *conclusively* presumed to be prejudicial and adopting a harmless error standard; if defendant shows "at least a possibility of prejudice", the State must prove harmlessness of error beyond a reasonable doubt).[8]

We hold that a defendant who has declined to waive his or her right to trial by a jury of 12 does not thereby automatically consent to an ex parte decision by the trial court to replace an initial juror with an alternate juror after deliberations have commenced.[9] We also hold that, after deliberations have commenced, the trial court should make a reasonable effort to contact both sides for their input into the court's discretionary decision to excuse and replace an initial juror with an alternate juror, even when it factually appears to the court that the initial juror is no longer able to serve.

We need not decide whether the trial court's failure to make such an effort here constitutes reversible error because we fully agree with the appellant that it was reversible error of constitutional magnitude to fail to instruct the reconstituted jury *on the record* that it must disregard all prior deliberations and begin deliberations anew. We reject the State's contention that because the record does not affirmatively reflect that the jury was *not* so reinstructed, appellant has failed to demonstrate a reasonable possibility of preju-

---

[8]The same "harmless error beyond a reasonable doubt" standard applies to review of issues of constitutional magnitude not timely raised below or raised for the first time on appeal. *Scott*, 110 Wn.2d at 688 (if the claim is of constitutional magnitude the reviewing court examines the effect the error had on the defendant's trial according to the harmless error standard set forth in *Chapman v. California*, 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824, 24 A.L.R.3d 1065 (1967)).

[9]This is not to say that such a defendant has veto power over the trial court's discretionary decision. Under the Federal Rules of Criminal Procedure a different rule may apply. *See, e.g., United States v. Olano*, 934 F.2d 1425, 1439 (9th Cir. 1991), *rev'd on other grounds*, ___ U.S. ___, 123 L. Ed. 2d 508, 113 S. Ct. 1770 (1993). However, Fed. R. Crim. P. 23(b) allows the trial court to determine in its own discretion whether to continue with only 11 jurors if one of the jurors must be excused after deliberations have commenced. Trial courts in Washington do not have this flexibility. *See* CrR 6.1.

dice. Such is not the proper test. An appellate court must be able to determine *from the record* that jury unanimity has been preserved.

In *State v. Badda*, 63 Wn.2d 176, 181-83, 385 P.2d 859 (1963), our Supreme Court considered the trial court's failure to instruct the jury, at any time during the trial, that its verdict must be unanimous. The State argued that the error was harmless in that the defendants had not requested such an instruction (an opportunity which we note was not afforded to appellant Ashcraft in this case and a premise since invalidated in any event, *see* RAP 2.5(a)), and a clerk's minute entry reflected that, after the verdict was delivered, the jury was polled and all 12 jurors answered that it was their individual verdict. In reversing and remanding for a new trial, the court noted that it could not be assured from that meager record that the jury's verdict was indeed unanimous. The case involved multiple defendants and multiple counts. The record did not disclose the specific questions posed by the court or the specific answers given. "In a criminal case we must be certain that the verdict is unanimous; in [*State v. Mickens*, 61 Wn.2d 83, 377 P.2d 240 (1962)] we were; here we are not." *Badda*, 63 Wn.2d at 183.

It is clear from subsequent case law that the failure to give a specific unanimity instruction when such an instruction is otherwise required may constitute *harmless* constitutional error, but since such is error of constitutional magnitude, it will *initially* be presumed to be prejudicial. The presumption may be overcome if and only if the reviewing court is able to express an abiding conviction, based on its independent review of the record, that the error was harmless beyond a reasonable doubt, that is, that it cannot possibly have influenced the jury adversely to the defendant and did not contribute to the verdict obtained. *See, e.g., State v. Kitchen*, 110 Wn.2d 403, 409-11, 756 P.2d 105 (1988); *see also Chapman v. California*, 386 U.S. 18, 23-24, 17 L. Ed. 2d 705, 87 S. Ct. 824, 24 A.L.R.3d 1065 (1967); *State v. Rice*, 120 Wn.2d 549, 569, 844 P.2d 416 (1993) ("[w]e deem constitutional error harmless if we are convinced beyond a rea-

sonable doubt that any reasonable jury would have reached the same result without the error").

The burden of proving harmlessness of constitutional error beyond a reasonable doubt lies with the State. *Chapman v. California*, 386 U.S. at 24; *Caliguri*, 99 Wn.2d at 508-09. A reviewing court must be able to determine *from the record* that jury unanimity has been preserved. *Badda*, 63 Wn. App. at 182-83; *Kitchen*, 110 Wn.2d at 411-12; *Fisch*, 22 Wn. App. at 383. Because here the trial court proceeded ex parte, neither the State nor the appellant had an opportunity to insure *for the record* that the instruction to disregard prior deliberations and to commence deliberations anew be given.[10] The purpose of CrR 6.5's requirement that the reconstituted jury be instructed to begin deliberations anew is to assure jury unanimity — to assure the parties, the public and any reviewing court that the verdict rendered has been based upon the consensus of the 12 jurors who rendered the final verdict, based upon the common experience of all of them. *Fisch*, 22 Wn. App. at 383.

The State has a heavy burden which it has not been able to meet in this case. We cannot find assurance in the record that the mandatory instruction was given. Nor are we able to determine that, if the instruction was not given, such error was harmless beyond a reasonable doubt. The initial jury deliberated for 4 hours without announcing a verdict. It is unclear from the record whether the reconstituted jury deliberated for 3 hours 22 minutes or (if a lunch break was taken) for some lesser period, perhaps under 2 hours. This case involved three separate counts and lesser included offense instructions as to each of those counts. It is not beyond the realm of reasonable possibility that, since the reconstituted jury was not properly reinstructed, the alternate and the re-

---

[10]CrR 6.15(f)(1) requires that, when supplemental instructions are given at the request of a deliberating jury, the parties be present or, if they are not, that the parties or their counsel be notified and that the additional instruction be given in writing. We commend this procedure to trial courts which are faced with a CrR 6.5 situation. By such means, there should be no question of whether the mandatory reinstruction has or has not been given. Moreover, such a procedure should obviate an additional constitutional issue which we have not found necessary to address in this appeal but which may well arise in other cases, that of the defendant's right to be present at each critical stage of the trial.

maining 11 initial jurors could have concluded, in all good faith but erroneously, that they need not deliberate anew as to any counts or issues upon which the initial 12 jurors may have reached agreement. There was substantial evidence to support the verdict reached but the evidence was not so overwhelming as to necessarily lead 12 fair-minded jurors to only one conclusion as to each count.[11]

In sum, the trial court should have made a reasonable effort to contact the parties through their counsel to obtain their input before rendering its discretionary decision to excuse juror Pascoe and replace him with alternate juror Goodin. The failure to make this effort was error. We need not and do not decide whether reversal was required on this ground alone, for the trial court's failure to reinstruct the reconstituted jury *on the record* that it must disregard the previous deliberations and begin deliberations anew was manifest constitutional error. On this record we cannot conclude that such error was harmless beyond a reasonable doubt.

The evidence being sufficient to support the verdicts rendered, and no other error being shown, we reverse and remand for a new trial as to all counts.

GROSSE and BAKER, JJ., concur.

---

[11]In *People v. Collins*, 17 Cal. 3d 687, 697, 552 P.2d 742, 748-49, 131 Cal. Rptr. 782 (1976), *cert. denied*, 429 U.S. 1077 (1977), the record clearly reflected that the reconstituted jury was not instructed to begin deliberations anew. The court found this to be constitutional error, but harmless error because the State's case was very strong and there was no reasonable probability that a more favorable verdict would have been returned if the jury had been properly instructed. We agree that this is the proper test in a case where constitutionally "tainted" evidence has been admitted. *See, e.g., State v. Whelchel*, 115 Wn.2d 708, 715, 728, 730, 801 P.2d 948 (1990) (where there is overwhelming evidence, apart from the constitutionally tainted evidence, error was harmless beyond a reasonable doubt). We question the applicability of such a test when the constitutional issue is jury unanimity. If such a test is appropriate, however, we observe that, although there was substantial evidence to support the verdict, the evidence was not so overwhelming as to necessarily lead 12 fair-minded jurors to only one conclusion as to each count. Accordingly, this case would fail the *Collins* test.