**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION II**

| | | |
|---|---|---|
| STATE OF WASHINGTON, | | No. 52001-0-II |
| Respondent, | | |
| v. | | |
| KYLA MARIE TILL, | | UNPUBLISHED OPINION |
| Appellant. | | |

GLASGOW, J.—After a bench trial, Kyla Marie Till was convicted of second degree assault for hitting and choking her six-year-old son, SWT, leaving significant bruises on his face and neck. Till appeals, arguing that there was insufficient evidence to support her conviction. Specifically, Till argues that the harm inflicted on SWT in the form of bruising was not sufficiently substantial, nor was there sufficient evidence to prove that she strangled SWT. Till also contends that some of SWT's hearsay statements were improperly admitted under RCW 9A.44.120, the child victim hearsay exception. Till also argues that the trial court erred in concluding that SWT was competent to testify at trial. Finally, Till asserts that the trial court improperly ordered Till to pay the criminal filing fee and DNA collection fee because she is indigent.

We conclude that the evidence was sufficient to support the conviction, that the child hearsay was properly admitted, and that the trial court did not err when it found SWT competent to testify. We affirm Till's conviction but remand for the trial court to reconsider the filing fee and DNA collection fee.

FACTS

A.      Findings Made After the Bench Trial

Following a bench trial, the trial court made findings of fact and conclusions of law that incorporated by reference the findings the trial court made orally after trial. Till does not assign error to any of the trial court's findings on appeal. The following facts reflect the trial court's findings.

One morning, Till called her son's day care center to let the staff know that SWT would be arriving later that afternoon and that he had bruises on his face. She explained the bruising was the result of a vehicle door hitting him in a parking lot the night before.

A neighbor dropped SWT off at the day care center later that day. On SWT's arrival, a day care employee, Melissa Stevenson, noticed suspicious bruising on SWT's face and neck and that makeup had been applied to cover it up. Stevenson took photos of SWT's face before and after she removed the makeup. After she removed the makeup, she realized there was more bruising, and that the markings were "a lot deeper" than she had originally thought. Verbatim Report of Proceedings (VRP) (Jan. 23, 2018) at 22. Stevenson said that SWT told her his father hit him, but she thought this was strange because she knew SWT did not live with his father. Stevenson called the police, and Aberdeen Police Officer Chad Pearsall and another officer were dispatched to the day care center to investigate.

The next day, Till made a written statement to police regarding what happened. In her statement, she admitted she got frustrated when SWT would not sit still for a haircut, and she slapped him with her right hand in the head three or four times. She initially denied any knowledge about the bruising on SWT's neck.

Till admitted she made up a "'random excuse'" and covered SWT's bruises with makeup in an attempt to avoid having SWT removed from her care. Clerk's Papers (CP) at 48. Eventually, Till admitted that she held SWT's chin and squeezed hard, leaving a bruise. Till said she then put SWT in the crease of her elbow "'in a choke[]hold fashion'" to keep him from moving. *Id*. She admitted she was not sure how hard she squeezed him. Till said she acted out of frustration and that SWT was screaming and crying the entire time.

Till said she noticed the markings on SWT after she let him go and that she became upset and started crying and apologizing. Till said she was "'freaking out'" because she hurt SWT. CP at 49. Till admitted that she told SWT to lie about what happened, otherwise he would "'go bye bye.'" *Id.*

Dr. Joyce Gilbert of the Sexual Assault Clinic and Child Maltreatment Center in Olympia, Washington, reviewed SWT's medical records and the reports and photos in this case. Dr. Gilbert thought that SWT's injuries could not have been caused by a car door because the bruising involved too many planes on the face. Dr. Gilbert classified the bruising as "serious." CP at 49. Dr. Gilbert also noted that SWT has a serious hereditary neurological condition that required him to have brain surgery in the past. She explained that the condition and history of brain surgery made it more likely that an injury to SWT's neck or head would be serious. Stevenson testified that she could still see bruising on SWT's face more than a month later when SWT returned to day care.

B.      Findings Relevant to Child Hearsay

In addition to its findings following the bench trial, the trial court entered findings of fact and conclusions of law regarding SWT's child hearsay statements and competency.[1] The findings in this order are also unchallenged on appeal. The following facts reflect the trial court's findings in the order.

When Stevenson noticed SWT's bruising at the day care, she spoke with SWT about what happened. Stevenson testified that SWT told her, "'Don't start with my mom because she'll get into trouble and we don't want that! Mom said dad did hit me really strong!'" CP at 37.

On the same day at the day care, Pearsall spoke with SWT. Pearsall testified that SWT first told him his father threw him against the floor. Pearsall knew that SWT did not live with his father and, when he pressed SWT for more information, SWT could only identify his father as "'Kyle.'" CP at 40. Pearsall also testified that SWT made a comment that he would get two toys if he did not tell what happened. SWT then told Pearsall that he was grabbed and thrown into the air. Pearsall said that he asked SWT if his mother grabbed him by the neck, and SWT stated that his mother had grabbed him and then hit him a few times.

Almost a month after the incident, SWT was interviewed by Mike Clark of Connections (formerly the Children's Advocacy Center of Grays Harbor). This interview was video recorded. In the interview, SWT confirmed that Till had hit and choked him.

Till challenged the admissibility of these hearsay statements and admission of the video interview into evidence under RCW 9A.44.120, the statutory exception to the hearsay rule for statements made by child abuse victims under the age of 10. Till also challenged these statements

---

[1] Some of the findings in this order are repeated in the findings of fact and conclusions of law following the bench trial.

under the *State v. Ryan*[2] factors, arguing that the statements were not sufficiently reliable. Specifically, Till asserted that SWT's statements made to Pearsall and Clark were the result of inappropriately leading questions.

The trial court concluded that the statements and video were admissible under the statutory hearsay exception, RCW 9A.44.120, because there was sufficient corroborative evidence of physical assault. Applying the *Ryan* factors, the trial court also concluded that the statements were admissible because the time, content, and circumstances of the statements provided sufficient indicia of reliability. The trial court concluded that Clark is a trained child interviewer and that his questioning of SWT was appropriate because he followed his discipline's protocol for interviewing a child. The trial court also concluded that Pearsall's questioning of SWT was minimal, appropriate, and not leading.

C.      Findings Relevant to Competency

Till also challenged SWT's competency to testify under RCW 50.60.050. SWT was still six years old at the time of trial. In the hearing to evaluate competency, SWT stated his name and identified his birthday. The State engaged SWT in a series of questions using pictures of objects. SWT could identify statements about the objects that were truthful and those that were lies. This was consistent with an exchange that Clark had with SWT when he interviewed the child, establishing that SWT understood what it meant to tell the truth.

Till's counsel also questioned SWT at the hearing. During this questioning, SWT identified the name and ages of his two sisters, as well as his own age. SWT also said that he sometimes told scary stories about monsters that he thought were true. He also said that stories about the tooth fairy were "[a] little true." VRP (Jan. 23, 2018) at 12. Based on his statements about monsters and

---

[2]103 Wn.2d 165, 691 P.2d 197 (1984).

the tooth fairy, Till argued that SWT could not receive just impressions of facts and relate them truly.

In its ruling on competency, the trial court explained, however, that an imaginative child is not necessarily incompetent to testify and that SWT was able to "recognize the difference between a truth and a lie." *Id.* at 14. The trial court also found that SWT demonstrated a six-year-old's ability to recall past events. The trial court concluded that SWT was competent to testify.

SWT testified at trial that Till had hit and kicked him while trying to give him a haircut, but did not say in his trial testimony that Till choked him.

D.      Conclusions After the Bench Trial

Relying on Till's own statements to police and at trial, the trial court found that Till had strangled SWT. The trial court also found, based on pictures admitted into evidence and Dr. Gilbert's testimony, that SWT's injuries constituted temporary but substantial disfigurement. Accordingly, the trial court found Till guilty of assaulting a child in the second degree under both the strangulation and substantial bodily harm prongs. The trial court also found that the offense was domestic violence related and that SWT was a particularly vulnerable victim because of his age and his preexisting health condition. Till appeals her conviction.

ANALYSIS

I. SUFFICIENCY OF THE EVIDENCE

Till argues that the State did not produce sufficient evidence to prove beyond a reasonable doubt that Till committed assault of a child in the second degree. Till asserts that there was insufficient evidence to show that she inflicted substantial bodily harm on SWT because his injuries were limited to external bruising. She also contends there was insufficient evidence to show that she strangled SWT under the statutory definition of "strangulation." We disagree.

A.    Sufficiency of the Evidence Standard

The State has the burden of proving all the elements of a crime beyond a reasonable doubt. *State v. Rich*, 184 Wn.2d 897, 903, 365 P.3d 746 (2016). When reviewing a claim of insufficient evidence, we ask whether a rational trier of fact could find that all the crime's essential elements were proved beyond a reasonable doubt. *Id*. We view all the evidence in the light most favorable to the State. *Id*. Furthermore, when a defendant challenges the sufficiency of the evidence, they admit the truth of the State's evidence, and we draw all reasonable inferences that arise from the evidence in the State's favor. *State v. Cardenas-Flores*, 189 Wn.2d 243, 265-66, 401 P.3d 19 (2017).

We consider both circumstantial and direct evidence to be equally reliable. *Id.* at 266. We defer to the trier of fact on issues of conflicting witness testimony, witness credibility, and the persuasiveness of the witness's testimony. *State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990). Specifically, when there has been a bench trial, our review is limited to determining whether substantial evidence supports the trial court's findings of fact and, if so, whether the findings support the conclusions of law. *State v. Stevenson*, 128 Wn. App. 179, 193, 114 P.3d 699 (2005). We treat unchallenged findings of fact as verities on appeal. *Id*. Notably, Till has not assigned error to any of the trial court's findings of fact.

B.    Assault of a Child in the Second Degree

As relevant to this case, assault of a child in the second degree occurs when a person who is over 18 years old commits the crime of assault in the second degree as defined in RCW 9A.36.021 against a child who is under 13 years old. RCW 9A.36.130. Under RCW 9A.36.021, the State can prove assault in the second degree in several ways. One way is through showing that the defendant "[i]ntentionally assault[ed] another and thereby recklessly inflict[ed] substantial

bodily harm." RCW 9A.36.021(1)(a). The State may also prove second degree assault by showing that the defendant "[a]ssault[ed] another by strangulation or suffocation." RCW 9A.36.021(1)(g).

### 1. Substantial bodily harm

RCW 9A.04.110(4)(b) defines "'[s]ubstantial bodily harm'" as "bodily injury which involves a temporary but substantial disfigurement, or which causes a temporary but substantial loss or impairment of the function of any bodily part or organ, or which causes a fracture of any bodily part." Till argues that injuries sustained by SWT were insufficient to meet this standard because they were only external, relatively minor, and were described throughout trial as mere "bruising," "markings," or "redness." Br. of Appellant at 10. Applying *State v. McKague*, 172 Wn.2d 802, 262 P.3d 1225 (2011) (per curiam), Till argues that courts require a more substantial injury than SWT sustained to satisfy this prong. We disagree.

In *McKague*, the Washington Supreme Court found that there was sufficient evidence to show substantial bodily harm when the adult victim was punched in the face, thrown to the ground, suffered facial swelling, and was diagnosed with a concussion. *Id.* at 806. The court held that "substantial" meant "a degree of harm that is considerable and necessarily requires a showing greater than an injury merely having some existence." *Id*. The court also approved of the dictionary definition, "'considerable in amount, value, or worth'" to mean "substantial." *Id*. (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2280 (2002)). Under this definition, the court concluded that the victim's facial bruising, swelling, and lacerations were severe enough to amount to temporary but substantial disfigurement. *Id.* In addition, the victim's concussion was enough to establish substantial impairment of a body part or organ function. *Id.*

The *McKague* court cited to *State v. Ashcraft*, 71 Wn. App. 444, 859 P.2d 60 (1993), and *State v. Hovig*, 149 Wn. App. 1, 202 P.3d 318 (2009), as examples of cases involving temporary

but substantial disfigurement. *Id.* In *Ashhcraft*, Division One recognized there was sufficient evidence to show "temporary but substantial disfigurement" when doctors found bruising on a five-year-old child consistent with being hit with a shoe. 71 Wn. App. at 455. In *Hovig*, this court agreed that "serious bruising can rise to the level of 'substantial bodily injury.'" 149 Wn. App. at 13. We found there was sufficient evidence of substantial bodily harm when the defendant bit his young child's face during a diaper change, leaving a "bright red, mouth-shaped bite mark." *Id.* at 5. A doctor who examined the child concluded that, although the bite had not broken skin, the baby had experienced pain and discomfort, and the bruising would persist for 7 to 14 days. *Id.* at 6. This was enough to show "'temporary but substantial disfigurement.'" *Id.* at 13 (quoting *Ashcraft*, 71 Wn. App. at 455).

Here, we affirm the trial court's finding that there was sufficient evidence to prove assault of a child in the second degree because SWT's bruises show temporary but substantial disfigurement amounting to substantial bodily harm. Till admitted that she left bruises on her son's face. The photos taken by Stevenson show bruising and other markings all over one side of his face and on his neck on the day after the incident. Like the physician in *Hovig*, Dr. Gilbert thought that SWT's injuries were "serious." CP at 49. Stevenson's testimony that SWT's bruising was still visible over a month later further demonstrates the severity of injury. Viewing all the evidence in the light most favorable to the State, the findings were sufficient to support the trial court's conclusion that SWT suffered substantial bodily harm.

2.     Strangulation

RCW 9A.04.110(26) defines "'[s]trangulation'" as "to compress a person's neck, thereby obstructing the person's blood flow or ability to breathe, or doing so with the intent to obstruct the person's blood flow or ability to breathe." Therefore, the State may prove strangulation either

through showing that the person's airway or blood flow was *actually* obstructed, or by showing that the perpetrator *intended* to obstruct the airway or blood flow, even if they were not successful in doing so. *State v. Reed*, 168 Wn. App. 553, 575-76, 278 P.3d 203 (2012).

Till argues that there is insufficient evidence to show that SWT's airway or blood flow was actually obstructed because he was able to scream and yell while Till held him down, and because he did not indicate that he could not breathe or felt light headed. Till points out that the only time SWT claimed he was choked was during his interview with Mike Clark. We conclude that there was sufficient evidence to show SWT's airway was actually obstructed. Therefore, we need not address whether Till intended to obstruct SWT's airway or blood flow.

In *State v. Rodriquez*, 187 Wn. App. 922, 352 P.3d 200 (2015), Division One clarified the meaning of "obstruct" under the definition of "strangulation" in RCW 9A.04.110(26). The *Rodriquez* court explained that "obstruct" means, not necessarily to completely block, but "to hinder or block to some degree." *Id.* at 935. Thus, "the statute applies equally to complete and partial obstructions of a victim's ability either to breathe or to experience blood flow." *Id.* The *Rodriquez* court concluded that, because the defendant grabbed the victim's neck and squeezed, the victim had difficulty breathing, and permanent marks were left on the victim's neck, there was sufficient evidence for the jury to find the defendant guilty of assault in the second degree by strangulation. *Id.* at 935-36.

Here, we conclude that there is sufficient evidence to show that Till strangled SWT under the meaning of the statute. *Rodriquez* makes it clear that evidence of partial obstruction is sufficient to show strangulation. Just because SWT could scream and yell does not necessarily mean that his airway or blood flow was not at least partially obstructed. Additionally, just because SWT did not

10

claim he had difficulty breathing or felt lightheaded does not prove that his airway was not partially obstructed.

SWT claimed that he was choked, Till admitted that she held SWT in a "choke[]hold fashion," CP at 48, Stevenson and both responding police officers testified they saw the bruising and redness on SWT's neck, and the photos Stevenson took show the redness and bruising on SWT's neck. When viewed in the light most favorable to the State, this evidence together is sufficient to prove that Till strangled SWT. The fact finder could have inferred from the severity of the markings on SWT's neck that his airway or blood flow was at least partially obstructed.

Viewing all the evidence in the light most favorable to the State, we affirm the trial court's finding that Till assaulted SWT by strangulation.

## II. EVIDENTIARY RULINGS

We review evidentiary decisions for abuse of discretion and will not reverse absent prejudice. *Sorenson v. Raymark Indus., Inc.*, 51 Wn. App. 954, 956, 756 P.2d 740 (1988). We apply an even more lenient standard of review for a bench trial because we presume that the judge did not consider and was not influenced by inadmissible evidence they might have heard, "thus avoiding any prejudice to the defendant." *State v. Melton*, 63 Wn. App. 63, 68, 817 P.2d 413 (1991).

A.    Child Hearsay

SWT made several out-of-court statements about the incident to Stevenson, Pearsall, and Clark. Till argues that the trial court abused its discretion by allowing these child hearsay statements into evidence under the hearsay exception for child abuse victims laid out in RCW 9A.44.120. Specifically, Till argues that there was no basis for the trial court to find that SWT

experienced substantial bodily harm, a finding the trial court must make for the exception to apply. We disagree.

RCW 9A.44.120 creates a specific exception to the hearsay rule, permitting a child abuse victim's hearsay statements to be admitted under certain circumstances. The statute, in relevant part, provides that a "statement not otherwise admissible by statute or court rule, is admissible in . . . . criminal proceedings . . . if . . . [i]t is made by a child when under the age of ten . . . describing any act of physical abuse of the child by another that results in substantial bodily harm as defined by RCW 9A.04.110." RCW 9A.44.120(1)(a)(i). For the statements to be admissible, the trial court must also find that "the time, content, and circumstances of the statement provide sufficient indicia of reliability; and . . . [t]he child either . . . [t]estifies at the proceedings; or . . . [i]s unavailable as a witness." RCW 9A.44.120(1)(b), (c)(i)-(ii).

Under ER 104(a), preliminary questions of fact concerning the admissibility of evidence "shall be determined by the court." In making this determination, the trial court "is not bound by the Rules of Evidence except those with respect to privileges." ER 104(a). Washington courts apply a preponderance of the evidence standard to questions of preliminary fact when determining the applicability of hearsay exceptions. *State v. Guloy,* 104 Wn.2d 412, 420, 705 P.2d 1182 (1985).

Here, Till argues only that, because there was no substantial bodily harm, the trial court should not have admitted the statements. However, the trial court only had to determine that there was substantial bodily harm by a preponderance of the evidence, a standard lower than beyond a reasonable doubt. Because we conclude above that that there was sufficient evidence to prove beyond a reasonable doubt that SWT suffered substantial bodily harm, the hearsay exception

clearly applies, and we conclude that the trial court did not abuse its discretion in admitting the statements.[3]

B.      Competency

Till argues that SWT was incompetent to testify because his stories to Pearsall and Clark were inconsistent and because he was "unable to distinguish fact from fiction." Br. of Appellant at 20. Till cites to SWT's statements at the competency hearing when he said that he liked to tell made-up stories about monsters and the tooth fairy and that he believed some of these stories were true. Till also argues that the object matching exercise used by the State during the testimony, and by Clark during the forensic interview, was insufficient to determine whether SWT could tell the truth from a lie. Till also argues that SWT did not have an independent recollection of the incident because, when speaking with SWT, Clark and Pearsall used leading questions and pushed him for answers he did not initially provide. We disagree.

RCW 5.60.050(2) prohibits testimony by "[t]hose who appear incapable of receiving just impressions of the facts, respecting which they are examined, or of relating them truly." "All persons, regardless of age, are subject to this rule," and are presumed competent to testify. *State v. S.J.W.*, 170 Wn.2d 92, 100, 239 P.3d 568 (2010). The party challenging the competency of the witness has the burden of proving the witness is incompetent by a preponderance of the evidence. *Id*.

The factors from *State v. Allen*, 70 Wn.2d 690, 424 P.2d 1021 (1967), "serve to inform the judge's determination" of child competency. *S.J.W.*, 170 Wn.2d at 100. The *Allen* factors include (1) the child's understanding of the obligation to speak the truth on the witness stand; (2) the child's

---

[3] Till does not otherwise challenge the admission of the child hearsay statements or take issue with the trial court's application of the *Ryan* factors addressing reliability.

mental capacity, at the time of the events in question, to receive an accurate impression of the events; (3) whether the child's memory is sufficient to retain an independent recollection of the events; (4) whether the child has the capacity to express in words his or her memory of the events; and (5) whether the child has the capacity to understand simple questions about the events. *Allen*, 70 Wn.2d at 692; *S.J.W.*, 170 Wn.2d at 99.

"We afford significant deference to the trial judge's competency determination," especially for child witnesses, and "we may disturb such a ruling only upon a finding of manifest abuse of discretion." *State v. Brousseau*, 172 Wn.2d 331, 340, 259 P.3d 209 (2011) (citing *State v. Leavitt*, 111 Wn.2d 66, 70, 758 P.2d 982 (1988)). The trial court is in the best position to observe the potential witness, especially a child witness. *State v. Kennealy*, 151 Wn. App. 861, 878, 214 P.3d 200 (2009). Moreover, "inconsistencies in the child's testimony go to weight and credibility, not competency." *Id*.

In *Kennealy*, this court affirmed that a child victim of sexual abuse was competent to testify even though his attention deficit hyperactivity disorder caused him to struggle to remember certain details about the events and he had recounted some details incorrectly. *Id*. The court found he was competent to testify because the record showed that he did not change his recollection of the main events of the abuse. *Id*. at 879. He was also able to testify to his age, his home environment, and his birthday. *Id*. He was able to accurately identify a truth and a lie, and he explained that he knew he would get in trouble if he told a lie. *Id*.

In *Leavitt*, the Washington Supreme Court upheld findings that a child victim was competent to testify when the record showed that she had answered many questions about knowing the difference between telling the truth and lying. 111 Wn.2d at 69. The court also found it relevant that she could identify family members, name her schoolteacher, and give the ages of her cousins.

*Id*. She was able to answer questions about the abuse that gave rise to the case, even though she replied, "'I don't know'" when asked about the details at trial. *Id*. (quoting record).

Here, under the *Allen* factors, we conclude the trial court did not abuse its discretion when it determined that Till was competent to testify. Till asserts that SWT's belief in stories about monsters makes him unable to discern the truth from a lie. In *Kennealy*, the court held that the first *Allen* factor (that the child be able to tell the truth on the witness stand) was satisfied when the child witness correctly identified true statements and lies on the witness stand. 151 Wn. App. at 879. SWT also showed that he could identify statements about objects that were true and statements that were lies both during trial and during his interview with Clark. SWT demonstrated that he knew the difference between a lie and the truth when Clark asked him factual questions in the interview, and SWT properly identified whether each statement was the truth or a lie.

Till also argues that SWT struggled to tell the truth because SWT's testimony was different from the story he told Clark and Pearsall. The courts in both *Kennealy* and *Leavitt* found child witnesses competent to testify even though the children's accounts of the incident of abuse were different at trial than they had been during previous interviews. *Kennealy*, 151 Wn. App. at 878-79; *Leavitt*, 111 Wn.2d at 69. Thus, the inconsistencies in SWT's statements do not necessarily mean SWT was incompetent to testify. In *Kennealy*, it was important that the testimony was consistent as to the main accounts of abuse. 151 Wn. App. at 879. And the court recognized that inconsistencies went to credibility, not competency. *Id.* at 878.

Here, SWT may have shared different accounts of the incident of abuse with Pearsall, Clark, and during his testimony. However, he was consistent in his story to each of them that his mother had hit him. Moreover, Till's own statement that she held SWT in a "'choke[]hold

fashion'" undermines the claim that SWT was not telling Clark the truth when he said that he was choked. CP at 48. We find that SWT's inconsistent statements do not undermine his competency.

Till also argues that SWT was not competent to testify because Clark and Pearsall used leading questions, pushing him to provide the answers that he did. However, a trial judge conducting a bench trial is particularly able to discern whether an adult's questions were leading in a way that influenced the child's answers. *Kennealy*, 151 Wn. App. at 878. Therefore, we conclude that any prior questions of a leading nature went to weight and credibility of SWT's testimony, not SWT's competency. This is not a valid basis for reversing the trial court's competency determination.

Finally, as *Kennealy* and *Leavitt* make clear, the fact that SWT was able to recite basic information about his life weighs in favor of the trial court's finding that SWT was competent to testify. His ability to relay facts goes to the *Allen* factors relating to memory, ability to understand simple questions, and ability to relay facts accurately. 70 Wn.2d at 692; *S.J.W.*, 170 Wn.2d at 99. For instance, SWT was able to recite lots of information about himself and others in his life during trial, such as his birthday, his name, his former living situation, his sisters' names, and his mother's name. All of this reflected his ability to retain information, recall it, and answer basic questions. *See Allen*, 70 Wn.2d at 692.

We conclude that the trial court did not abuse its discretion when it determined that SWT was competent to testify.

We hold that the trial court did not err in finding SWT competent or in admitting child hearsay statements. Furthermore, we hold that substantial evidence in the record supports the trial court's findings of fact, and those findings support the trial court's conclusion that Till was guilty of second degree assault of a child. Accordingly, we affirm Till's conviction.

### III. LEGAL FINANCIAL OBLIGATIONS

Till submitted supplemental briefing arguing that the trial court improperly ordered her to pay a criminal filling fee and a DNA collection fee. Our commissioner granted a motion to accept supplemental briefing on this issue. The State did not respond or concede to either argument raised in this supplemental briefing.

Till asserts that she should not be required to pay the criminal filing fee or the DNA collection fee because she is indigent under RCW 10.101.010(3) and because the law changed after her sentencing while her case was pending on appeal. Till also argues that she should not be required to pay the DNA collection fee because she was convicted of a felony in the past and she has paid the DNA collection fee before.

In 2018, the legislature amended RCW 36.18.020(2)(h), that now prohibits imposition of the criminal filing fee on a defendant who is indigent as defined in RCW 10.101.010(3)(a)-(c). This amendment applies prospectively to cases pending on direct appeal. *State v. Ramirez*, 191 Wn.2d 732, 749-50, 426 P.3d 714 (2018). A DNA collection fee is mandatory "unless the state has previously collected the offender's DNA as a result of a prior conviction." RCW 43.43.7541; *see Ramirez*, 191 Wn.2d at 747.

We remand for a determination of whether the defendant is indigent under RCW 10.101.010(3)(a)-(c) and whether Till's DNA collection fee has been previously collected. On remand, the State bears the burden of demonstrating that Till's DNA collection fee has not previously been collected. *State v. Houck*, 9 Wn. App. 2d 636, 640, 446 P.3d 646 (2019).

CONCLUSION

We affirm Till's conviction, but remand for reconsideration of the criminal filing fee and the DNA collection fee.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Glasgow, J.

We concur:

_____
Maxa, J.

_____
Sutton, A.C.J.