# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 71665-4-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | |
| | ) | |
| OTHNIEL RUIZ BLANCAFLOR and | ) | PUBLISHED |
| CYNTHIA C. BLANCAFLOR, | ) | |
| | ) | FILED: August 25, 2014 |
| Appellants. | ) | |
| | ) | |

Cox, J. — "Fail[ure] to instruct the reconstituted jury *on the record* that it must disregard all prior deliberations and begin deliberations anew" is reversible error of constitutional magnitude.[1] In such a case, the State has the burden to prove beyond a reasonable doubt that the error is harmless.[2]

Here, the trial court instructed the original 12 jurors to begin deliberations when they retired to the jury room. Thereafter, one of the original jurors was excused. After an alternate juror joined the remaining 11 original jurors, the court failed to instruct the reconstituted jury that it must disregard all prior deliberations

---

[1] State v. Ashcraft, 71 Wn. App. 444, 464, 859 P.2d 60 (1993) (emphasis in original).

[2] Id. at 465-66.

and begin deliberations anew. This was manifest error affecting the constitutional right of the defendants to jury unanimity, which may be raised for the first time on appeal.[3] Because the State fails in its burden to show beyond a reasonable doubt that this error was harmless, we reverse and remand for trial.

In 2005, Othniel and Cynthia Blancaflor bought My Grandma's House, an adult care facility, located in Pierce County. Othniel was primarily responsible for payroll and accounting, and Cynthia was primarily responsible for patient contracts.[4]

Starting in 2006, My Grandma's House began to experience financial instability. Cynthia also began working as an auditor for the Department of Labor and Industries.

In 2007, My Grandma's House was no longer able to retain an accountant, so Othniel became the bookkeeper. Othniel decided to convert two of his employees into independent contractors and allegedly stopped paying industrial insurance premiums to the Department. It appears that under the law these employees did not meet the test for independent contractors.

Cynthia claims that she did not know about Othniel's decision to stop paying premiums at the time.

In 2008, the Blancaflors allegedly failed to pay two employees their full wages, and the employees eventually quit. The employees filed a complaint

---

[3] State v. Lamar, 180 Wn.2d 576, 327 P.3d 46, 51 (2014).

[4] We use the first names of these parties for clarity.

regarding the unpaid wages, which led to an audit of My Grandma's House by the Department of Labor and Industries.

Thereafter, the State charged Othniel and Cynthia each with three counts of violating RCW 51.48.020(1)(b), employer's false reporting or failure to secure payment of compensation.[5] The charging periods for these counts were for the years 2007, 2008, and 2009. The State also charged them each with one count of first degree theft.

Following closing arguments at trial, the court instructed the jury to commence deliberations. Shortly after the jury retired to the jury room, it informed the court that one of the original 12 jurors had a flight scheduled to depart the next day.

Eventually, the trial court excused this juror and replaced the juror with an alternate, who had previously been released. The trial court did not instruct the reconstituted jury to begin deliberations anew after seating the alternate.

The reconstituted jury returned guilty verdicts on all charges for both defendants.

They both appeal.

## JURY UNANIMITY

Othniel argues that his constitutional right to an impartial and unanimous jury was violated because the trial court replaced an original juror with an alternate and failed to instruct the reconstituted jury to disregard any prior deliberations and begin deliberations anew. Cynthia joined in this argument at

---

[5] Clerk's Papers (Cynthia Blancaflor) at 30-33; Clerk's Papers (Othniel Blancaflor) at 61-64.

3

oral argument before this court. Because the trial court failed to instruct the reconstituted jury to begin deliberations anew and the State fails in its burden to prove beyond a reasonable doubt that this error was harmless, we must reverse all convictions of both defendants and remand for trial.

"Our state constitution requires that in a criminal prosecution an impartial jury render a unanimous verdict."[6] In State v. Lamar, the supreme court recently explained that "[j]ury unanimity means that jurors should reach 'consensus . . . through rational, persuasive argument' among themselves."[7] A consensus is "reached after each juror examines the evidence and the parties' arguments about what the evidence means, in light of the jury instructions, and all of the jurors exchange their individual perceptions, experiences, and assessments."[8]

There, the supreme court concluded that Lonnie Lamar's right to jury unanimity had been violated.[9] It explained that after an "alternate juror was substituted, the reconstituted jury was not instructed on its duty to engage in this deliberative process anew."[10]

CrR 6.5, governing the use of alternate jurors, embodies these rights and provides a way to ensure that these rights are protected.[11] This rule states, "If

---

[6] Lamar, 327 P.3d at 50 (citing WASH. CONST. art. I, §§ 21, 22).

[7] 180 Wn.2d 576, 327 P.3d 46, 50 (2014) (second alteration in original) (quoting Saul M. Kassin, The American Jury: Handicapped in the Pursuit of Justice, 51 OHIO ST. L.J. 687, 703 (1990)).

[8] Id. at 51.

[9] Id.

[10] Id.

[11] See Ashcraft, 71 Wn. App. at 463.

4

the jury has commenced deliberations prior to replacement of an initial juror with an alternate juror, the jury shall be instructed to disregard all previous deliberations and begin deliberations anew."[12]

The purpose of such an instruction "is to assure jury unanimity—to assure the parties, the public and any reviewing court that the verdict rendered has been based upon the consensus of the 12 jurors who rendered the final verdict, based upon the common experience of all of them."[13]

It is "reversible error of constitutional magnitude to fail to instruct the reconstituted jury *on the record* that it must disregard all prior deliberations and begin deliberations anew."[14] Claims of constitutional error are reviewed de novo.[15]

In State v. Ashcraft, the jury deliberated for a time before the trial court replaced one of the jurors with an alternate.[16] The trial court did not instruct the reconstituted jury on the record to begin deliberations anew after seating the alternate.[17] The parties argued whether such an instruction needed to be on the record.[18] This court concluded that it was "reversible error of constitutional

---

[12] CrR 6.5.

[13] Ashcraft, 71 Wn. App. at 466.

[14] Id. at 464 (emphasis in original).

[15] State v. Stanley, 120 Wn. App. 312, 314, 85 P.3d 395 (2004).

[16] 71 Wn. App. 444, 450, 859 P.2d 60 (1993).

[17] Id. at 451.

[18] Id. at 464.

magnitude to fail to instruct the reconstituted jury *on the record* that it must disregard all prior deliberations and begin deliberations anew."[19] It explained that an "appellate court must be able to determine *from the record* that jury unanimity has been preserved."[20] Because the State failed in its burden to show beyond a reasonable doubt that the error was harmless, this court reversed and remanded for trial.[21]

In State v. Stanley, the jury deliberated before an alternate replaced one of the original jurors.[22] The reconstituted jury continued deliberating before returning a verdict.[23] The record did not indicate whether the trial court instructed the reconstituted jury to begin deliberations anew.[24]

The State conceded that the trial court committed error.[25] But it argued that the error was harmless because the record suggested that the "reconstituted jury did deliberate anew, and because the evidence against [Michael] Stanley was overwhelming."[26] This court concluded that the State had "not met its heavy burden to prove beyond a reasonable doubt the harmlessness of the error."[27] It

---

[19] Id. (emphasis in original).

[20] Id. at 465 (emphasis in original).

[21] Id. at 466-67.

[22] 120 Wn. App. 312, 313, 85 P.3d 395 (2004).

[23] Id.

[24] Id.

[25] Id. at 316.

[26] Id.

[27] Id. at 317.

explained, "It is not beyond the realm of reasonable possibility that the reconstituted jury could have concluded that it need not begin deliberations anew as to any issues already considered by the original 12 jurors."[28] This court reversed and remanded for trial.[29]

Here, on September 21, 2011, following the giving of the trial court's instructions to the jury and closing arguments, the court instructed the jury to retire to the jury room and begin deliberations. It stated, "At this time, I am instructing you to take your notes and your jury instructions with you into the jury room to commence your deliberations."[30] According to the record, the jury exited the courtroom at 3:30 p.m. At 3:37 p.m., the jury informed the court that it had a question.

At 4:04 p.m., the court went on the record. Counsel for both defendants were present, but their respective clients were not. The jury remained in the jury room.

The trial court explained that the jury informed the court that Juror Number 3 had a plane ticket for a flight scheduled to depart the next day. The trial court called Juror Number 3 into the courtroom from the jury room and questioned her. The trial court then asked the juror to go back to the jury room.

The trial court then explained to counsel that it did not want to take any action because the defendants were not present. Accordingly, the trial court

---

[28] Id.

[29] Id. at 318.

[30] Report of Proceedings (Sept. 21, 2011) at 985.

directed all original twelve jurors to report back at 9 a.m. the next day. All of the original jurors, except Juror Number 3, remained in the jury room from the time they retired to the jury room at 3:30 p.m. until they were dismissed for the day at 4:10 p.m.[31]

The next day, on September 22, 2011, with counsel and their respective clients present, the trial court brought all of the original jurors into the courtroom.[32] The court permanently excused Juror Number 3 based on the questioning on the record the previous afternoon. The court then stated the following:

> Which leaves 11 remaining. We need a little bit of time for [the judicial assistant] to [contact] the first alternate. I need you to wait in the jury room until the first alternate arrives. If for some reason the first alternate is unavailable, we will contact the second alternate. Once all 12 of you are present, you will then be given the jury instructions and the admitted exhibits, and you will then be able to commence your deliberations. Hopefully this will not result in a significant delay. Thank you very much. I would ask you to go into the jury room at this time.[33]

After the eleven remaining jurors went to the jury room, the court discussed how it intended to replace the original Juror Number 3 with an alternate:

> Okay. All right. So if we haven't heard back within a half an hour, then I will instruct [the judicial assistant] to try to contact Alternate No. 2. Either way, we'll let you know that we have heard from Alternate 1 and they're on their way or we have not and we're now contacting alternate No. 2.

---

[31] Id. at 985-95; Supplemental Clerk's Papers (Othniel Blancaflor) at 18.

[32] Report of Proceedings (Sept. 22, 2011) at 1001-02.

[33] Id. at 1002.

. . .

Thank you.  You guys can all go.

(Recess taken.)

(Jury deliberating.)[34]

This record shows that an alternate juror joined the original eleven jurors at 10:32 a.m.  The reconstituted jury announced its verdict of guilty on all counts at 2:15 p.m. that same day.

It is undisputed that this record shows that the trial court instructed the original jury to commence deliberations when it retired to the jury room following closing arguments.  It is also undisputed that the court never instructed the reconstituted jury to begin deliberations anew after the original Juror Number 3 was replaced with an alternate.  This latter failure was a manifest error of constitutional magnitude.

Nevertheless, the State asserts that the trial court did not need to instruct the reconstituted jury to begin deliberations anew because the original twelve jurors had not begun deliberations before the reconstituted jury began its deliberations.  The record simply does not support this assertion.

The State's assertion rests on two unpersuasive arguments.  It first points to the trial court's statement that "'[the jurors] haven't actually started their deliberations.'"[35]  The trial court made this statement on the record, outside the

_____

[34] Id. at 1004.

[35] Respondent's Supplemental Brief at 7 (quoting Report of Proceedings (Sept. 22, 2011) at 1001).

.

presence of the jury, and before Juror Number 3 was permanently excused.[36] The State characterizes this statement as an uncontroverted factual determination that should be treated as a verity on appeal.[37]

While the trial court made this statement, the record shows that it was based on the court's assumption about what had taken place in the jury room. Nowhere in this record did the court ask the original jurors whether they had begun deliberations, as the court expressly instructed when they first retired to the jury room. In any event, even if the court's statement is properly characterized as a factual finding, appellate counsel properly challenged it on appeal. Thus, we reject this argument.

The State's second unpersuasive argument, unsupported by citation to authority, is that we should presume that the original jurors had not begun deliberations.[38] But the well-recognized rule is that we presume that the jury, as originally constituted, followed the court's instructions to begin deliberations after retiring to the jury room.[39] This record simply does not reflect what went on in the jury room other than what we have described. We reject the State's attempt for us to speculate on the basis of an unfounded presumption that is contrary to well-established law.

---

[36] Report of Proceedings (Sept. 22, 2011) at 1001.

[37] Respondent's Supplemental Brief at 7.

[38] Id. at 8.

[39] See Lamar, 327 P.3d at 51 ("'Juries are presumed to follow instructions absent evidence to the contrary.'") (quoting State v. Dye, 178 Wn.2d 541, 556, 309 P.3d 1192 (2013)).

The State also contends that "it would not make any sense to **presume** that the jurors had started deliberations at the end of the day on [September] 21, 2011, given that they had not received the admitted exhibits or the original jury instructions; there is no indication that their electronic devices had been collected yet." But these assertions are also not supported by the record.

While the minutes of the proceeding state that the jury did not have the admitted exhibits or the original jury instructions on September 21, 2011, the trial court did not tell the original jury that they could not start deliberating if they did not have these items. Rather, the trial court stated that the judicial assistant "need[s] just a minute to collect up all of these admitted exhibits and the original jury instructions and take them into the jury room for your use, **but you can certainly get started** by selecting your presiding juror."[40] Then, as previously discussed, the trial court stated, "At this time, I am instructing you to take your notes and your jury instructions with you into the jury room **to commence your deliberations**."[41] This record supports our prior conclusion that the presumption is that the jurors followed this instruction of the court.

Similarly, the record does not support the assertion that the jury did not commence deliberations because the judicial assistant had not collected the jurors' electronic devices. While there is a minute entry on September 22 that the judicial assistant collected the devices, the absence of a similar entry on September 21 does not mean that this did not occur. Moreover, the trial court did

---

[40] Report of Proceedings (Sept. 21, 2011) at 985 (emphasis added).

[41] Id. (emphasis added).

not instruct the jury that it could not begin deliberations until the devices had been collected. Rather, the trial court stated,

> I believe I previously instructed you that communication devices are not allowed in the deliberation room, so when you go in there in a moment, any cell phones, laptops, any iPads, or anything like that will be collected by [the judicial assistant], and you may have them back at the end of the day. The same is true tomorrow.[42]

And again, the court's final instruction to the jury was to "*commence [its] deliberations.*"[43]

For similar reasons, the State's argument that "it would not make sense for the jury to raise the question of Juror Number 3's availability and then start to deliberate in the 20 or so minutes before the end of the day" is also not persuasive. It is nothing more than pure speculation as to what did not take place behind the closed door of the jury room.

We conclude that the failure to instruct the reconstituted jury to begin deliberations anew was a manifest constitutional error. Thus, it was the State's burden to prove beyond a reasonable doubt that this constitutional error was harmless.

In an attempt to meet this burden, the State points to the fact that the reconstituted jury deliberated for approximately 3 hours and 15 minutes before reaching a verdict. This tells us nothing about the critical question: whether the reconstituted jury began anew to deliberate, notwithstanding the absence of an

---

[42] Id.

[43] Id. (emphasis added).

instruction from the court. Thus, this argument falls short of the requirement to prove beyond a reasonable doubt that the error was harmless.

The State also argues that there was overwhelming evidence to support the guilty verdicts. We disagree.

While there is sufficient evidence to support the verdicts, the evidence is "not so overwhelming as to necessarily lead 12 fair-minded individuals to only one conclusion."[44] For example, the intent elements for the crimes charged were based on credibility determinations. We simply do not know whether these credibility determinations were made unanimously by all twelve of the jurors of the reconstituted jury or based in part on prior deliberations. That is the whole point of the constitutional protection of unanimity that must be protected in this case. Like Stanley, it is "not beyond the realm of reasonable possibility that the reconstituted jury could have concluded that it need not begin deliberations anew as to any issues already considered by the original 12 jurors."[45] The State fails to make the case that the constitutional protection is preserved under the facts of this case.

In sum, we conclude that the failure to instruct the reconstituted jury to begin deliberations anew was constitutional error. The State has failed in its burden to show beyond a reasonable doubt that this error was harmless. The remedy is reversal of all convictions of these defendants.

---

[44] Stanley, 120 Wn. App. at 318.

[45] Id. at 317.

13

We address certain of the remaining issues raised on appeal because they are likely to recur on remand. We decline to address other issues raised either in the appeal or in the statements of additional grounds because we need not reach them. Those other issues involve an ineffective assistance of counsel claim, a motion to substitute counsel, and a prosecutorial misconduct claim.

We also deny Cynthia's motion for leave to file a pro se supplemental brief because we need not reach the issues she raises in her motion.

## DOUBLE JEOPARDY

*Multiple Punishments for Same Offense*

The State charged each of the defendants with three counts of violating RCW 51.48.020(1)(b), employer's false reporting or failure to secure payment of compensation.

Othniel argues that this statute makes the charged conduct one continuing offense. Thus, he contends that he could only be punished for one violation of RCW 51.48.020(1)(b), not three. Cynthia joined in this argument at oral argument of this case before this court. We hold that there is no violation of double jeopardy in this case.

The double jeopardy provisions of the federal and state constitutions protect an individual from being punished multiple times for the same offense.[46]

---

[46] State v. Sutherby, 165 Wn.2d 870, 878, 204 P.3d 916 (2009) (citing U.S. CONST. amend. V.; WASH. CONST. art. I, § 9).

"When a defendant is convicted for violating one statute multiple times, each conviction must be for a separate 'unit of prosecution.'"[47]

"The proper inquiry for considering double jeopardy challenges is what 'unit of prosecution' the [l]egislature intends as a punishable act under the statute."[48] To determine the legislature's intent, a court uses "traditional tools of statutory construction."[49] These tools include the statute's plain language and legislative history.[50] A plain language analysis includes examination of the statutory scheme as a whole, "considering the language of the statute, related statutes, and other provisions of the same act."[51]

"If a statute does not clearly and unambiguously identify the unit of prosecution, then we resolve any ambiguity under the rule of lenity to avoid 'turning a single transaction into multiple offenses.'"[52]

This court reviews de novo a unit of prosecution claim.[53]

RCW 51.48.020(1)(b), within the Industrial Insurance Act, provides criminal penalties for an employer's false reporting of payroll or employee hours:

---

[47] State v. Vars, 157 Wn. App. 482, 498-99, 237 P.3d 378 (2010) (quoting State v. Adel, 136 Wn.2d 629, 632, 965 P.2d 1072 (1998)).

[48] State v. Turner, 102 Wn. App. 202, 206, 6 P.3d 1226 (2000) (quoting Adel, 136 Wn.2d at 634).

[49] Vars, 157 Wn. App. at 499.

[50] Id.

[51] State v. Reis, 180 Wn. App. 438, 443, 322 P.3d 1238 (2014).

[52] Sutherby, 165 Wn.2d at 878-79 (internal quotation marks omitted) (quoting Adel, 136 Wn.2d at 634-35).

[53] State v. Durrett, 150 Wn. App. 402, 406, 208 P.3d 1174 (2009).

(b) An employer is guilty of a class C felony, if:

(i) The employer, with intent to evade determination and payment of the correct amount of the premiums, **knowingly makes misrepresentations regarding payroll or employee hours**; or

(ii) The employer engages in employment covered under this title and, with intent to evade determination and payment of the correct amount of the premiums, knowingly fails to secure payment of compensation under this title or **knowingly fails to report the payroll or employee hours related to that employment**.[54]

Here, the State charged each defendant with three counts of false reporting. The charging periods for these counts were based on conduct during 2007, 2008, and 2009, respectively.

The primary issue is whether the false reporting statute clearly and unambiguously identifies the "unit of prosecution" for this felony. We first consider the language of RCW 51.48.020(1)(b).[55]

Othniel and Cynthia focus on the use of plural language in RCW 51.48.020(1)(b). They assert that the "use of plural language, rather than words 'specifying the singular,' indicates legislative intent to broadly define the unit of prosecution as including multiple acts over a period of time."[56] For example, they point to the words "misrepresentations," "employee hours," and "premiums" in the charging statute to illustrate this point.[57]

---

[54] (Emphasis added.)

[55] See Durrett, 150 Wn. App. at 406.

[56] Appellant Othniel Blancaflor's Supplemental Brief at 17-18.

[57] Id.

But the use of this plural language in this provision does not clearly indicate the unit of prosecution. For example, the words "premium" and "premiums" are sometimes used interchangeably in the Industrial Insurance Act. The act defines "'premium' and/or 'premiums'" as "taxes, which are the money payments by an employer or worker which are required by this title to be made to the state treasury for the accident fund, the medical aid fund, the supplemental pension fund, or any other fund created by this title."[58] Thus, it is not clear whether the use of "premiums" in RCW 51.48.020(1)(b) includes all premiums assessed and owing over an extended period of time—weeks, months, or years—or whether it is limited to a specified time period.

Similarly, the words "misrepresentations" and "employee hours" in this provision do not indicate to what time period this language applies. For example, "employee hours" could include either a total of hours over one day or a total over a longer period of time.

Thus, the plain language of RCW 51.48.020(1)(b) does not clearly and unambiguously identify the unit of prosecution. It does not specify to what specific time period employer's false reporting applies.

The lack of clarity in RCW 51.48.020(1)(b) does not end our inquiry. We look to other provisions within this statute.

RCW 51.48.020(1)(c) is the provision that directly follows RCW 51.48.020(1)(b). RCW 51.48.020(1)(c) states:

> Upon conviction under (b) of this subsection, the employer shall be ordered by the court to *pay the premium due and owing*, a

---

[58] RCW 51.08.015; see also Respondent's Supplemental Brief at 13.

penalty in the amount of one hundred percent of the premium due and owing, and interest on the premium and ***penalty from the time the premium was due*** until the day of payment.[59]

Under this subsection, a penalty for violating RCW 51.48.020(1)(b) is to "pay the premium due and owing" plus interest from "the time the premium was due until the day of payment."[60] This penalty indicates that the legislature intended that an employer shall be punished based on "the time the premium was due."[61] Thus, the question is when "the premium [is] due."[62]

The State argues that we should look to RCW 51.16.060, a related statutory provision within the Industrial Insurance Act, to answer this question. We do so here.

RCW 51.16.060 states:

Every employer not qualifying as a self-insurer, shall insure with the state and shall, on or before the last day of ***January, April, July and October of each year*** thereafter, furnish the department with a true and accurate payroll for the period in which workers were employed by it during the preceding ***calendar quarter***, the total amount paid to such workers during such preceding ***calendar quarter***, and a segregation of employment in the different classes established pursuant to this tile, and ***shall pay its premium thereon to the appropriate fund***. Premiums for a ***calendar quarter***, whether reported or not, ***shall become due*** and delinquent on the day immediately following the last day of the month following the ***calendar quarter***.[63]

---

[59] RCW 51.48.020(1)(c) (emphasis added).

[60] Id.

[61] Id.

[62] Id.

[63] RCW 51.16.060 (emphasis added).

This statute makes clear that an employer shall truly and accurately report payroll for employees four times each year on a "calendar quarter" basis.[64] More importantly, it makes clear that the required premium is due each "calendar quarter."[65] We conclude from RCW 51.48.020(1)(c) and this related statute that the unit of prosecution for the charged crime of employer's false reporting is when the premium is due, which is each calendar quarter.

Both parties cite legislative history to support their respective arguments. We generally need not consider legislative history if the statutory language shows the intent of the legislature.[66] But we do address legislative history in this case to make clear that it is not helpful.

The parties cite the bill reports for senate bill (SB) 5570, which expanded tax evasion penalties and added much of the language that currently is in RCW 51.48.020(1)(b). The final bill report provided the following background:

> A significant number of potential criminal fraud cases, many involving hundreds of thousands of dollars, are routinely rejected by the AG's office because the employer never filed a quarterly report and did not, therefore, violate existing felony laws. The current statute on "failure to secure payment of compensation" makes such failure a misdemeanor with a maximum $100 fine per day. Personnel in the Department of Labor and Industries have no recollection of anyone being prosecuted under the misdemeanor provisions. According to the Assistant Attorney General with the economic crimes unit, that unit has never prosecuted misdemeanors and local prosecutors would generally not consider a misdemeanor prosecution for this offense worth the expenditure of resources.[67]

---

[64] Id.

[65] Id.

[66] See State v. Diaz-Flores, 148 Wn. App. 911, 917 n.1, 201 P.3d 1073 (2009).

[67] FINAL B. REP. on S.B. 5570, 55th Leg., Reg. Sess. (Wash. 1997).

As the bill report's background information explains, former RCW 51.48.015 (1971) provided the penalties for an employer who failed to secure payment of compensation. This failure was a misdemeanor with a daily fine.[68] To correct what was identified as a problem, SB 5570 repealed RCW 51.48.015 and revised RCW 51.48.020 to make it a class C felony for an employer to falsely report payroll or employee hours or fail to secure payment of compensation.[69] But this legislative history does not indicate what unit of prosecution the legislature intended by making these changes. That is why this history is not helpful.

Othniel and Cynthia do not address the State's argument based on RCW 51.48.020(1)(c) and RCW 51.16.060. Rather, they argue that the unit of prosecution is the "on-going conduct of falsely reporting information to the State."[70] They cite State v. Durrett to support this argument.[71] That case is distinguishable.

There, Donnie Durrett was a convicted sex offender.[72] He was statutorily required to report weekly to the sheriff's office because he did not have a fixed residence.[73] This court considered whether Durrett's "failure to report weekly

---

[68] S.B. REP. on S.B. 5570, 55th Leg., Reg. Sess. (Wash. 1997) (citing former RCW 51.48.015 (1971)).

[69] FINAL B. REP. on S.B. 5570, 55th Leg., Reg. Sess. (Wash. 1997).

[70] Appellant Othniel Blancaflor's Supplemental Brief at 16-19.

[71] Id. at 18 (citing State v. Durrett, 150 Wn. App. 402, 208 P.3d 1174 (2009)).

[72] Durrett, 150 Wn. App. at 404.

[73] Id. at 405.

during the two charged time periods constituted only a single criminal act or one 'unit of prosecution.'"[74]  This court held that conviction for two counts of failure to register as a sex offender violated double jeopardy.[75]

In reaching this conclusion, the court looked to related statutory provisions to the charged crime in effect at the time to determine the unit of prosecution.[76] Former RCW 9A.44.130 (2006) imposed on "specified sex offenders a general duty to register with the sheriff of the county in which they live."[77]  Former RCW 9A.44.130(6)(b) required "offenders who have no fixed residence to 'report weekly, in person, to the sheriff of the county where he or she is registered.'"[78] Former RCW 9A.44.130(11)(a) provided that "'[a] person who knowingly fails to comply with *any of the requirements* of this section is guilty of a class C felony.'"[79]

Based largely on the ambiguity in the word "any" in the statute, this court held that former RCW 9A.44.130(11)(a) "can reasonably be construed either to punish each weekly failure to report or the failure to comply with the ongoing duty to report."[80]  It applied the rule of lenity to interpret the statute as punishing "a

---

[74] Id. at 406.

[75] Id. at 404.

[76] Id. at 406-07.

[77] Id. at 406 (citing former RCW 9A.44.130 (2006)).

[78] Id. at 407 (quoting former RCW 9A.44.130(6)(b) (2006)).

[79] Id. (alteration in original) (citing former RCW 9A.44.130(11)(a) (2006)).

[80] Id. at 410.

course of conduct—the failure to comply with the ongoing duty to report—rather than each separate failure to report."[81]

Here, RCW 51.48.020(1)(b) does not contain the word "any." Thus, much of the analysis in Durrett does not apply to this case. Moreover, unlike that case, the related statutes in this case are quite specific that the required premium and required reports are due on a calendar quarter basis. For these reasons, Durrett does not control here.

In sum, RCW 51.48.020(1) and RCW 51.16.060, a related statute, show that the legislature intended that the unit of prosecution for this felony is when the premium is due. The premium is due each calendar quarter.

The remaining question is whether the State's election to charge one count for each of three successive calendar years was proper. It is well-established that "prosecutors have considerable latitude to either aggregate charges or to bring multiple charges."[82] Because the unit of prosecution for this felony is each calendar quarter, the State was well within its discretion when it charged three counts of violation of RCW 51.48.020(1)(b), one for each of three successive years.

### Sufficiency of the Evidence

Cynthia and Othniel both argue that the evidence admitted at trial was insufficient to support one of their convictions. Cynthia asserts that the State produced insufficient evidence to convict her of violating RCW 51.48.020(1)(b),

---

[81] Id. (emphasis omitted).

[82] See State v. Kinneman, 120 Wn. App. 327, 337, 84 P.3d 882 (2003).

employer's false reporting or failure to secure payment of compensation. Othniel contends that the State produced insufficient evidence to convict him of first degree theft. We disagree with both arguments and address the issue so that there is no question that they may be tried again on remand without violating double jeopardy.

When reviewing a sufficiency challenge, this court views the evidence in the light most favorable to the State and asks whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[83] This court draws all reasonable inferences from the evidence in favor of the State.[84] Circumstantial evidence is as reliable as direct evidence.[85] A defendant challenging the sufficiency of the evidence "admits the truth of the State's evidence."[86] This court does not review credibility determinations, which are for the trier of fact.[87] Thus, this court defers to the jury on issues of conflicting testimony, witness credibility, and persuasiveness of the evidence.[88]

First, Cynthia argues that the State produced insufficient evidence to prove that she intended to evade paying the proper insurance premiums and that

---

[83] State v. Hosier, 157 Wn.2d 1, 8, 133 P.3d 936 (2006).

[84] Id.

[85] State v. Delmarter, 94 Wn.2d 634, 638, 618 P.2d 99 (1980).

[86] State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).

[87] State v. Camarillo, 115 Wn.2d 60, 71, 794 P.2d 850 (1990).

[88] State v. Walton, 64 Wn. App. 410, 415-16, 824 P.2d 533 (1992).

she knowingly made misrepresentations or failed to report the payroll or employee hours. We disagree.

As previously discussed, under RCW 51.48.020(1)(b), an employer commits a felony if:

> (i) The employer, with intent to evade determination and payment of the correct amount of the premiums, knowingly makes misrepresentations regarding payroll or employee hours; or

> (ii) The employer engages in employment covered under this title and, with intent to evade determination and payment of the correct amount of the premiums, knowingly fails to secure payment of compensation under this title or knowingly fails to report the payroll or employee hours related to that employment.

Here, the State presented sufficient evidence to prove that Cynthia intended to evade determination and payment of the correct amount of premiums and that she knowingly made misrepresentations or failed to report the payroll or employee hours. The State presented evidence that Cynthia was a "full journey level auditor" with the Department, which meant that she completed her training and was meeting her auditing goals. During her training, Cynthia learned about what type of employees were "covered" and required payment of industrial insurance premiums.

Three employees testified that Cynthia would pay them in cash and that sometimes she did not pay them their full wage. Two employees testified that Cynthia told them that they would need to fill out different tax forms and would not have any deductions taken out of their paychecks.

Additionally, a Department employee testified that Cynthia had contacted the Department and informed it that My Grandma's House had zero employee

hours to report for the second and third quarters of 2008. By adjusting these hours, Cynthia was essentially stating that My Grandma's House did not owe any premiums during that time. But two employees testified that they were employed by My Grandma's House during at least part of these quarters.

Taking this evidence in the light most favorable to the State and drawing all reasonable inferences in favor the State, a rational trier of fact could have found beyond a reasonable double that Cynthia intended to evade determination and payment of the correct amount of premiums and that she knowingly made misrepresentations or failed to report the payroll or employee hours.

Cynthia argues that Othniel and she both testified that she did not participate in accounting, payroll, or reporting of employees. She also asserts that the State placed "undue weight" on the fact that she was an auditor for the Department. Thus, she contends there was insufficient evidence to prove that she intended to evade determination and payment of the correct amount of premiums.

Similarly, Cynthia asserts that she called the Department only after Othniel reported the employee hours and requested that My Grandma's House be closed. Thus, she contends that she had no knowledge of unreported employees.

But, as previously discussed, the State presented evidence contrary to her assertions. This court defers to the trier of fact's credibility determinations and resolution of conflicting testimony.[89] Thus, these arguments are not persuasive.

---

[89] Walton, 64 Wn. App. at 415-16.

Second, Othniel argues that the State produced insufficient evidence to prove that he intended to deprive employees of their wages for his first degree theft charge. We again disagree.

Under former RCW 9A.56.030(1)(a) (2007), "A person is guilty of theft in the first degree if he or she commits theft of . . . Property or services which exceed(s) one thousand five hundred dollars in value other than a firearm as defined in RCW 9.41.010." RCW 9A.56.020 defines "theft" as "[t]o wrongfully obtain or exert unauthorized control over the property or services of another or the value thereof, with *intent to deprive him or her of such property or services*."[90]

Here, the State presented sufficient evidence to prove that Othniel intended to deprive his employees of their wages. Two former employees testified that Othniel kept them employed even though he would not be able pay them their wages. Edward Hoff testified that there were times when My Grandma's House did not pay him his wages that he earned. Hoff eventually resigned because his payments from My Grandma's House "always had been delayed." When he resigned, he asserted that he was owed outstanding wages that were never paid to him.

Elvira Viray also testified that My Grandma's House did not pay Viray the entire amount of wages she earned. When Viray left My Grandma's House, she did not receive her last paycheck.

---

[90] (Emphasis added.)

Taking this evidence in the light most favorable to the State and drawing all reasonable inferences in favor of the State, a rational trier of fact could have found beyond a reasonable doubt that Othniel intended to deprive these employees of their wages.

Othniel argues that he never intended to deprive these employees of their wages. Rather, he points to evidence to show that he did not pay their wages because his business and personal finances failed. But a reasonable inference can be drawn from the evidence previously described that Othniel intended to deprive the employees of their wages. The jury was free to reject Othniel's evidence to the contrary and find that he was not credible. As previously discussed, this court defers to the trier of fact's credibility determinations and resolution of conflicting testimony.[91] Thus, this argument is not persuasive.

We reverse the convictions and remand for retrial of both defendants.

_Cox, J._

WE CONCUR:

---

[91] Walton, 64 Wn. App. at 415-16.