FILED
COURT OF APPEALS
DIVISION II

2013 JUL -2 AM 9: 06

STATE OF WASHINGTON

BY_____
          DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 42781-8-II |
| Respondent, | |
| v. | |
| YOVANY GOMEZ-HERNANDEZ, a/k/a YOVANY HERNANDEZ GOMEZ | |
| Appellant. | UNPUBLISHED OPINION |

WORSWICK, C.J. — Yovany Gomez Hernandez appeals his first degree assault conviction, challenging the sufficiency of the evidence and the term of his community custody. In his statement of additional grounds, Gomez[1] claims that prosecutorial misconduct denied him a fair trial. Because the evidence was insufficient to demonstrate an infliction of great bodily harm and because Gomez fails to show prosecutorial misconduct, we reverse his first degree

---

[1] The parties refer to Yovany Gomez Hernandez as Gomez. We do so as well.

assault conviction and remand for the trial court to enter judgment and sentence against Gomez for the lesser degree offense of second degree assault.[2]

## FACTS

On May 4, 2011, Gomez struck his wife, Anna Lila Garcia Campuzano. The next day, Campuzano[3] went with their three children to stay with her brother, Hector Garcia. About seven or eight o'clock that evening, Gomez knocked on Garcia's door, asking that he be let in to talk with Campuzano. According to Garcia, Gomez pushed his way through the door, breaking the doorframe. Campuzano was in the bathroom and eventually allowed Gomez to enter so they could talk. Gomez told her, "You will need to come home. Come home with me." Report of Proceedings (Sept. 26, 2011) (RP) at 48. When Campuzano told him no, Gomez punched her in the eye.

She then left the bathroom and Gomez followed her into a bedroom, where Gomez continued to insist that she go home with him. She eventually walked out of the bedroom into the kitchen hallway, trying to wriggle loose when he grasped her hand. When she noticed him looking at a knife block in the kitchen, she ran toward the bathroom. But Gomez grabbed her ponytail and she fell into the bathroom, briefly losing consciousness. When she awoke, Gomez was standing near her and a knife was in the bathroom sink.

---

[2] While the State concedes that the community custody term is incorrect on the judgment and sentence, we do not address this claim as Gomez will be sentenced for a different offense.

[3] The parties refer to Anna Lila Garcia Campuzano as Ana Lilia and as Campuzano. We use Campuzano to avoid confusion with Hector Garcia.

She got up, went to the bedroom, and was talking with Gomez when she felt something wet on the back of her neck. When she wiped it with her hand, her hand came back bloodied. Gomez apologized, insisted that they go home, and insisted that she let him take care of the injury. But instead, she had Garcia take her to the hospital.

Dr. Paula Godfrey treated Campuzano in the emergency room. She observed a one centimeter wide stab wound on the back of Campuzano's neck that penetrated three and a half inches deep. Godfrey explained that Campuzano was very fortunate because the neck is a very complex area of the body and the blade could easily have severed an artery, the spinal cord, the brain stem, or a lung. She described such an injury as "potentially very life threatening." RP (Sept. 27, 2011) at 12. While acknowledging that Campuzano had none of these injuries, she observed that Campuzano had "significant tenderness to the back of the neck and sustained some injury to the musculature in the back of the neck and the subcutaneous tissue." RP (Sept. 27, 2011) at 18. Dr. Godfrey released Campuzano after suturing the wound. She explained that Campuzano would have a "pretty minimal" permanent scar from the injury. RP (Sept. 27, 2011) at 28.

The State charged Gomez with first degree assault while armed with a deadly weapon and that the crime involved domestic violence. In addition to the facts we set out above, Garcia testified that he witnessed Gomez stab Campuzano. He also testified that Gomez told Campuzano at the hospital that she should say that she stabbed herself.

Gomez denied being angry, breaking Garcia's door, hitting Campuzano, or telling Campuzano to lie. He also explained that Campuzano knocked over the knife block in the

kitchen, that the paring knife fell out, that he picked it up, and that she pushed him away when he was trying to hug her and the knife accidently went in. Gomez denied that he intended to injure Campuzano.

The trial court's to-convict instruction on first degree assault provided:

> To convict the defendant of the crime of assault in the first degree, each of the following elements of the crime must be proved beyond a reasonable doubt:
> (1) That on or about 5 May 2011, the defendant assaulted Ana Lilia Garcia-Campuzano;
> (2) That the defendant acted with intent to inflict great bodily harm;
> (3) That the assault resulted in the infliction of great bodily harm; and
> (4) That this act occurred in the State of Washington.

Clerk's Papers (CP) at 20. The trial court defined "great bodily harm" as:

> Great bodily harm means bodily injury that creates a probability of death, or that causes significant serious permanent disfigurement, or that causes a significant permanent loss or impairment of the function of any bodily part or organ.

CP at 19. The trial court also instructed the jury on the lesser-degree offense of second degree assault. The trial court's to-convict instruction provided:

> To convict the defendant of the crime of assault in the second degree, each of the following elements of the crime must be proved beyond a reasonable doubt:
> (1) That on or about 5 May 2011, the defendant intentionally assaulted Ana Lilia Garcia-Campuzano and thereby recklessly inflicted substantial bodily harm; or assaulted Ana Lilia Garcia-Campuzano with a deadly weapon and;
> (2) That this act occurred in the State of Washington.

CP at 25. The trial court did not define "substantial bodily harm."

During closing arguments, the State argued that Gomez committed first degree assault because the knife wound created a probability of death. The State based this argument on Dr. Godfrey's testimony that had the knife penetrated at a slightly different angle, Campuzano could

4

have died as a result. The State argued, alternatively, that under the lesser degree offense instruction, the jury merely had to find that Gomez assaulted Campuzano with a deadly weapon.

The jury found Gomez guilty of first degree assault. And it found by special verdicts that he was armed with a deadly weapon and that the offense involved domestic violence. Gomez appeals.

## ANALYSIS

### I. SUFFICIENCY OF THE EVIDENCE

Gomez first argues that the State failed to prove great bodily harm and therefore we must reverse his conviction. He argues that the State did not prove the severity of the injuries to meet this standard, which means "the most serious injuries short of death." *State v. Stubbs*, 170 Wn.2d 117, 128, 240 P.3d 143 (2010).

When facing a challenge to the sufficiency of the evidence, we ask whether, after viewing the evidence in a light most favorable to the State, any rational trier of fact could have found the essential elements of the charged crime beyond a reasonable doubt. *State v. Green*, 94 Wn.2d 216, 221, 616 P.2d 628 (1980). Because credibility determinations are for the trier of fact and are not subject to review, *State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990), we defer to the trier of fact's resolution of conflicting testimony, evaluation of witness credibility, and decisions regarding the persuasiveness of the evidence. *State v. Walton*, 64 Wn. App. 410, 415-16, 824 P.2d 533 (1992).

We accept the State's concession that Gomez did not inflict injuries creating a probability of death. The evidence at trial demonstrated that had the knife penetrated at a different angle,

Campuzano could have died or faced a probability of death. But the injuries she suffered were minor, creating only soreness and sensitivity while they healed. This is not the type of injury the legislature intended when criminalizing the infliction of great bodily harm. *See Stubbs*, 170 Wn.2d at 128 ("'Great bodily harm' . . . encompasses the most serious injuries short of death.").

The State argues, nonetheless, that the resulting scar on Campuzano's neck satisfies the "great bodily harm" definition because it is a "significant serious permanent disfigurement." CP at 19. While no court has defined this, in *State v. Hill*, 48 Wn. App. 344, 347, 739 P.2d 707 (1987), the court defined "serious permanent disfigurement" as: "'that which impairs or injures the beauty, symmetry or appearance of a person or thing; or that renders unsightly, misshapen, or imperfect, or deformed in some manner.'"[4] (Quoting *Gillman v. Gillman,* 319 So.2d 165, 166 (Fla.Dist.Ct.App.1975)). According to Dr. Godfrey, Campuzano had a "pretty minimal" permanent injury. RP at 28. This certainly does not meet the definition of *significant* serious permanent disfigurement.

The State cites *State v. Ashcraft*, 71 Wn. App. 444, 455, 859 P.2d 60 (1993), to argue that bruising is sufficient to prove great bodily harm. But *Ashcraft* involved "substantial bodily harm," which the trial court defined as a "temporary but substantial disfigurement." 71 Wn. App. at 455. This is not the same as a "significant serious permanent disfigurement." *Ashcraft* simply does not apply. The evidence here showed permanent disfigurement but not significant serious permanent disfigurement. We reverse Gomez's conviction of first degree assault.

---

[4] "Serious permanent disfigurement" is one definition of "serious bodily injury." *Hill*, 48 Wn. App. at 347.

6

## II. LESSER-DEGREE OFFENSE

Alternatively, the State asks that we remand and direct the trial court to enter a finding of guilt on second degree assault. We agree that this is the proper remedy.

Our Supreme Court held that remand for imposition of a lesser-included conviction is proper if (1) the trial court instructed the jury on the lesser-included offense and (2) the jury necessarily considered the elements of the offense in finding guilt on the greater, reversed, offense. *Green*, 94 Wn.2d at 234. Our Supreme Court recently reaffirmed this two-part requirement in *In re Pers. Restraint of Heidari*, 174 Wn.2d 288, 292-94, 274 P.3d 366 (2012).

Here, the trial court explicitly instructed the jury on the lesser-degree offense of second degree assault. And the jury, in finding guilt on the greater offense, considered all of the elements of second degree assault. It found that Gomez assaulted Campuzano and did so with a deadly weapon. We remand for the trial court to enter a conviction for second degree assault.

## III. PROSECUTORIAL MISCONDUCT

In his statement of additional grounds, Gomez argues that prosecutorial misconduct denied him a fair trial. In particular, he argues that the prosecutor misrepresented Dr. Godfrey's testimony in order to ensure his conviction of first degree assault. We review this claim because, if valid, Gomez would receive a new trial on the lesser-degree offense. *See State v. Reed*, 102 Wn.2d 140, 145, 684 P.2d 699 (1984) (prosecuting attorney's comments during closing argument may constitute improper misconduct entitling a petitioner to a new trial).

We review a trial court's ruling on allegations of misconduct during closing argument for an abuse of discretion. *State v. Stenson*, 132 Wn.2d 668, 718, 940 P.2d 1239 (1997). The

7

defendant alleging such misconduct must show that the prosecutor's conduct was both improper and prejudicial. *State v. Emery*, 174 Wn.2d 741, 756, 278 P.3d 653 (2012). We will reverse for prosecutorial misconduct when there is a substantial likelihood that the argument affected the jury verdict. *Emery*, 174 Wn.2d at 760. But if a defendant fails to object to improper comments at trial, request a curative instruction, or move for a mistrial, this court will not reverse unless the misconduct was so flagrant and ill-intentioned that no curative instructions could have obviated the prejudice engendered by the misconduct. *Emery*, 174 Wn.2d 760-61.

Gomez argues that the prosecutor misstated the evidence when he argued in closing the following: "You heard Dr. Godfrey say that this was a life threatening injury, [and] that [Campuzano] could have died from that particular injury." RP (Sept. 27, 2011) at 105. As we note above, Dr. Godfrey testified that if the knife had penetrated at a different angle, it could have killed or seriously injured Campuzano. Dr. Godfrey did not testify that Campuzano could have died from the actual injury Gomez inflicted. Nonetheless, Gomez fails to show that the prosecutor's remarks were flagrant and ill-intentioned or that a curative instruction would not have obviated any prejudice. Further, the trial court instructed the jury that counsels' statements are not evidence and to decide the case on the evidence and exhibits given and admitted at trial. "We presume that juries follow the instructions and consider only evidence that is properly before them." *State v. Perez-Valdez*, 172 Wn.2d 808, 818-19, 265 P.3d 853 (2011).

No. 42781-8-II

We reverse Gomez's conviction of first degree assault and remand for entry of judgment and sentence for second degree assault.[5]

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Worswick, C.J.

We concur:

_____
Johanson, J.

_____
Lee, J.P.T.

---

[5] Gomez has not challenged the special verdicts on appeal and absent briefing on the matter, we do not address whether instruction 19 and the law of the case doctrine apply. *See State v. Willis*, 153 Wn.2d 366, 374, 103 P.3d 1213 (2005) (unobjected to jury instructions become the law of the case); *State v. Hickman*, 135 Wn.2d 97, 105, 954 P.2d 900 (1998) (State must prove additional element in jury instruction because it did not object at trial.).