IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 39226-1-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| WILLIAM ALEXANDER HARRIS, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, C.J. — William Alexander Harris appeals his conviction for fourth degree assault—domestic violence. He contends the State provided insufficient evidence to convict him. We disagree, affirm his conviction, but remand for the trial court to strike the victim penalty assessment (VPA) and DNA collection fee.

FACTS

William Alexander Harris and Juliette Baxter began dating in early 2020. That summer, Mr. Harris moved in with Ms. Baxter and her two sons, B.M., then 15 years old, and A.M., then 8 years old. In February 2021, the couple got engaged.

In April 2021, after many arguments and communication issues, Ms. Baxter attempted to end the relationship. However, when she learned she was pregnant with Mr. Harris' child, she decided that she would marry him. The couple married in June 2021.

As her pregnancy progressed, Ms. Baxter became sick and developed complications, including pregnancy-induced hypertension, chronic anemia, and preeclampsia,[1] so she was ordered to stay on bedrest.

On August 26, 2021, the couple argued throughout the day via text message and phone calls about a car that Mr. Harris hoped to sell, but had disappeared from where it was parked. When Mr. Harris returned home from work and walked in the door, Ms. Baxter heard him yell at one of her sons as she laid in bed.

Mr. Harris then entered the couple's bedroom, upset, and threw his keys and wallet onto the dresser. The couple started arguing about the car again, then Mr. Harris lost control. He lunged at Ms. Baxter and started poking her and screaming at her. As Ms. Baxter sat up in the bed, Mr. Harris continued to poke her, causing her to fall backward onto the bed. She became concerned for the baby as Mr. Harris got on top of her and continued poking her in the forehead and screaming. She was able to sit back up after kicking her leg and telling him to get off.

When she asked Mr. Harris what he was doing, he raised his fist like he was going to punch her in the face. She screamed, "[d]on't hit me" multiple times because she

---

[1] "Preeclampsia" is "a toxic condition developing late in pregnancy characterized by a sudden rise in blood pressure, excessive gain in weight, generalized edema, albuminuria, severe headache, and visual disturbances." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1786 (1993).

2

"thought one hundred percent" he was going to hit her in the face. Rep. of Proc. (RP) (Aug. 23, 2022) at 241-42. He ended up hitting her right shoulder, and she fell back on to the bed.

After Mr. Harris hit Ms. Baxter, B.M. opened the bedroom door, stood in the doorway, and said, "[d]on't hit my mom." RP (Aug. 23, 2022) at 243. Mr. Harris taunted B.M. then grabbed him by his shirt and swung his head into the door frame, causing him to lose consciousness. Mr. Harris then threw B.M. onto the floor. Ms. Baxter called 911 when she noticed B.M. was not moving. The 911 call lasted 26 seconds, during which Ms. Baxter was sobbing and struggling to communicate with the dispatcher. Before Ms. Baxter could tell the 911 dispatcher what occurred, or her address, Mr. Harris took the phone and hung up. Mr. Harris screamed at Ms. Baxter that she could send him to prison and that he would kill himself if she did. He told Ms. Baxter to not tell the cops what happened because he was not ready to go back to prison.

When the police arrived, Ms. Baxter told the police that she and Mr. Harris had a verbal argument. She believed Mr. Harris was sorry and that B.M. was going to be alright because he was awake. After the police left, B.M. emerged from his room, crying from pain, stating that he did not remember what happened to him. Mr. Harris told Ms. Baxter to take B.M. to the hospital and say that after their argument, he was leaving the

3

bedroom and B.M. hit his head on the door frame as he entered the bedroom.  Ms. Baxter

agreed to lie if Mr. Harris promised to leave the house and never see her kids again.

Keeping her agreement, Ms. Baxter lied to the emergency room staff about what

happened to B.M.  She believed Mr. Harris was sorry and knew he was on probation.[2]

She did not want him to go back to prison because she was concerned about her

pregnancy and the fact that she was sick and on bedrest.  The emergency room doctor

eventually advised B.M. that he suffered a concussion.  The next day, Ms. Baxter

photographed B.M.'s injuries.

Almost two months later, on October 10, after convincing B.M. to press charges,

Ms. Baxter called the police to report what really happened on August 26.  An officer

took written statements from both Ms. Baxter and B.M., and obtained a release for

B.M.'s hospital record.  After the officer took their statements, Ms. Baxter e-mailed him

photographs of B.M.'s injuries and screen shots of text messages between herself and Mr.

Harris.[3]

---

[2] Mr. Harris was serving a 30-year suspended sentence and probation supervised by the Washington State Department of Corrections for a 1999 first degree murder conviction out of Virginia.

[3] These images and screenshots were admitted as exhibits during trial, but were not included in the record on appeal.

*Procedure*

The State charged Mr. Harris with second degree assault—domestic violence against B.M., and fourth degree assault—domestic violence against Ms. Baxter.

During trial, Ms. Baxter, law enforcement, and B.M.'s emergency room doctor testified consistent with the facts above.

B.M. also testified. He recalled Mr. Harris arriving home on the night of the assault upset and yelling at his brother A.M. Mr. Harris then went into his bedroom, slammed the door, and began to argue with Ms. Baxter. After hearing arguing for around 10 to 15 minutes and hearing his mother loudly scream, "'[d]on't hit me,'" B.M. became concerned. RP (Aug. 24, 2022) at 454-55. He got out of bed, opened the bedroom door, and saw Mr. Harris standing over his mother on the bed. B.M. did not recall anything after that moment until he awoke on his bed suffering from a head injury. When he awoke, he was confused because he did not know what happened, the side of his face was swollen, and Mr. Harris was repeatedly apologizing.

Mr. Harris testified in his defense. He claimed Ms. Baxter called him a "stupid mother fucker" during their argument in the bedroom, which caused him to get angry. RP (Aug. 25, 2022) at 545. He said he pointed at her forehead and told her not to talk to him like that, but never touched her forehead. He denied hitting Ms. Baxter's right shoulder. He claimed Ms. Baxter slapped away his hand, started kicking him, and yelled,

5

"'You're not gonna hit me. You're not gonna hit me." RP (Aug. 25, 2022) at 545. He tried to grab her feet and hands to stop her from kicking and slapping him. Then, he encountered B.M. at the bedroom door. B.M. appeared upset and had his fists balled up as if he was ready to fight. Mr. Harris begged B.M. to let him out of the room. When B.M. would not move, Mr. Harris tried to grab B.M. and the pair wrestled in the hallway. Mr. Harris then heard a thud, and saw B.M. on the ground. Mr. Harris assumed that B.M. had hit his head on the crib in the bedroom.

The jury acquitted Mr. Harris of second degree assault, but convicted him of fourth degree assault and answered yes to the domestic violence special verdict. The court sentenced Mr. Harris to serve 364 days of confinement and imposed a mandatory $500 VPA and a mandatory $100 DNA collection fee.

## ANALYSIS

SUFFICIENCY OF THE EVIDENCE

Mr. Harris contends the State failed to provide sufficient evidence to prove his fourth degree assault conviction. We disagree.

"The sufficiency of the evidence is a question of constitutional law that we review de novo." *State v. Rich*, 184 Wn.2d 897, 903, 365 P.3d 746 (2016). Due process requires the State to prove all elements of the crime beyond a reasonable doubt. *State v. Aver*, 109 Wn.2d 303, 310, 745 P.2d 479 (1987); U.S. CONST. amend. XIV; WASH. CONST. art. I,

§ 3.  When a defendant challenges the sufficiency of the evidence, the proper inquiry is

"whether, after viewing the evidence in the light most favorable to the State, any rational

trier of fact could have found guilt beyond a reasonable doubt."  *State v. Salinas*, 119

Wn.2d 192, 201, 829 P.2d 1068 (1992).  "[A]ll reasonable inferences from the evidence

must be drawn in favor of the State and interpreted most strongly against the defendant."

*Id*.  Furthermore, "[a] claim of insufficiency admits the truth of the State's evidence and

all inferences that reasonably can be drawn therefrom."  *Id.*  This is a deferential

standard, and questions of credibility, persuasiveness, and conflicting testimony must be

left to the jury.  *In re Pers. Restraint of Martinez*, 171 Wn.2d 354, 364, 256 P.3d 277

(2011); *see also State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990).  Our review

is highly deferential to the jury's decision.  *State v. Davis*, 182 Wn.2d 222, 227, 340 P.3d

820 (2014).

Here, the trial court provided the jury with the following definition of "assault"

based on 11 *Washington Practice: Washington Pattern Jury Instructions: Criminal* 35.50

at 619 (5th ed. 2021):

> An assault is an intentional touching or striking of another person
> that is harmful or offensive regardless of whether any physical injury is
> done to the person.  A touching or striking is offensive if the touching or
> striking would offend an ordinary person who is not unduly sensitive.
> An assault is also an act done with intent to inflict bodily injury upon
> another, tending but failing to accomplish it and accompanied with the

apparent present ability to inflict the bodily injury if not prevented.  It is not necessary that bodily injury be inflicted.

An assault is also an act done with the intent to create in another apprehension and fear of bodily injury, and which in fact creates in another a reasonable apprehension and imminent fear of bodily injury even though the actor did not actually intend to inflict bodily injury.

Clerk's Papers at 41.  Harris did not object or take exception to this instruction.

Ms. Baxter testified Mr. Harris hit her right shoulder and poked her forehead numerous times to the point that she fell backward onto her bed.  This testimony was sufficient for the rational jury to find that (1) Mr. Harris intentionally touched or struck Ms. Baxter in a manner that was offensive, even though she was not physically injured, and (2) being hit on the shoulder or poked on the forehead numerous times would offend an ordinary person who is not unduly sensitive.

Ms. Baxter also testified she believed that Mr. Harris would hit her when he drew back his fist, causing her to yell "don't hit me" multiple times.  B.M. testified that he heard his mother yell "'[d]on't hit me'" and saw Mr. Harris standing over his mother while she was on the bed.  RP (Aug. 24, 2022) at 455.  This testimony was sufficient for the rational jury to find that (1) Mr. Harris intended to create the apprehension and fear of bodily injury in Ms. Baxter, (2) Mr. Harris' actions in fact created in Ms. Baxter a reasonable apprehension and imminent fear of bodily injury, (3) even if Mr. Harris did not actually intend to inflict bodily injury.

8

Viewing the evidence in the light most favorable to the State, we conclude that a rational jury could have found Mr. Harris guilty of fourth degree assault beyond a reasonable doubt under the first and third definitions of fourth degree assault in the jury instructions. Again, the questions of credibility, persuasiveness, and conflicting testimony are for the jury, and our review is highly deferential to the jury's decision. *Martinez*, 171 Wn.2d at 364; *Davis*, 182 Wn.2d at 227.

Mr. Harris argues that case law generally requires at least one witness to an assault, other than the victim, to sustain an assault conviction. He cites a series of cases where appellate courts affirmed assault convictions based on witnesses having seen the assault, or pictures or videos of the assault. Br. of Appellant at 15-17 (citing *State v. Davis*, 119 Wn.2d 657, 835 P.2d 1039 (1992); *State v. Loos*, 14 Wn. App. 2d 748, 473 P.3d 1229 (2020); *State v. Stevens*, 158 Wn.2d 304, 143 P.3d 817 (2006); *State v. Hummel*, 68 Wn. App. 538, 843 P.2d 1125 (1993); *State v. Conway*, 24 Wn. App. 2d 66, 519 P.3d 257 (2022), *review denied*, 200 Wn.2d 1032, 525 P.3d 151 (2023); *State v. Ashcroft*, 71 Wn. App. 444, 859 P.2d 60 (1993); *State v. Jarvis*, 160 Wn. App. 111, 246 P.3d 1280 (2011); *State v. Taylor*, 140 Wn.2d 229, 996 P.2d 571 (2000)).

The State counters, arguing that none of those cases held that a conviction would be reversed unless the assault was observed by a witness. The State points to a case where an assault conviction was affirmed, even though no one witnessed the assault and

No. 39226-1-III
*State v. Harris*

the victim recanted her original statement to police. Br. of Resp't at 10 (citing *State v. Case*, 13 Wn. App. 2d 657, 663, 466 P.3d 799 (2020)).

We agree with the State. Although the cases cited by Mr. Harris involved assault convictions affirmed based on witness testimony, videos, and pictures, none of those cases held that having a nonvictim witness was required to sustain an assault conviction.

VPA AND DNA COLLECTION FEE

Mr. Harris contends the VPA and the DNA collection fee must be struck from his judgment and sentence due to changes in the law. The State concedes. We accept the State's concessions and decline to elaborate further on this firmly established area of law.

Affirmed, but remand to strike the VPA and DNA collection fee.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Lawrence-Berrey, C.J.

WE CONCUR:


_____          _____
Fearing, J.                              Pennell, J.

10